# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1575

WILLIAM L. LUCAS,

*Plaintiff-Appellant,*

*v.*

CHICAGO TRANSIT AUTHORITY,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois,
Eastern Division.
No. 01 C 7075—**Harry D. Leinenweber**, *Judge.*

_____

ARGUED OCTOBER 24, 2003—DECIDED MAY 14, 2004

_____

Before BAUER, EASTERBROOK and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* William L. Lucas filed discrimina-
tion and retaliation claims against the Chicago Transit
Authority ("CTA"), alleging violations of Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The CTA
filed a motion for summary judgment. The district court
granted the CTA's summary judgment motion. Mr. Lucas
timely appealed. For the reasons set forth in the following
opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts[1]

### 1. 1997 Internal EEO Complaint of Discrimination

Mr. Lucas is an African-American male who has been employed with the CTA since 1993. Mr. Lucas was hired as a track inspector, maintaining and repairing sections of track and surrounding right of ways to ensure the tracks were safe for CTA trains. In 1997, Mr. Lucas briefly held a different position within the Track Maintenance Department as a machine operator. For this position, Mr. Lucas trained to operate a "Tie Inserter/Extractor machine" and a "Tie Handler machine." As their names suggest, the Tie Inserter/Extractor enables CTA employees to remove and replace railroad ties, and the Tie Handler machine is used to stack railroad ties prior to their insertion or after their extraction. Mr. Lucas had the most seniority and obtained the highest passing score for employees learning to use the Tie Inserter/Extractor machine; however, he only was permitted to operate that machine three times. Instead, he was often assigned to work on the Tie Handler machine, a machine he considered less desirable. Mr. Lucas asked Senior Roadmaster James Blatz for assignments to operate the inserter/extractor machine, but Blatz denied the request. Mr. Lucas then asked another supervisor, Joe Ryan, but he refused to intervene. Finally, Mr. Lucas asked General Manager Ray Schriks for assistance, but this request also was to no avail.

---

[1] Because this is an appeal from the district court's grant of summary judgment, we must construe all facts in the light most favorable to the non-moving party, Mr. Lucas. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000).

After his unsuccessful attempts to gain experience on the Tie Inserter/Extractor machine, Mr. Lucas filed an internal complaint with the CTA Affirmative Action Unit on September 27, 1997. In that complaint, Mr. Lucas checked the box that indicated that he was alleging race discrimination by his supervisor, Blatz. Mr. Lucas elaborated by explaining that Blatz had denied him the opportunity to operate the inserter/extractor machine, and that General Manager Schriks had responded to Mr. Lucas' complaints about this issue in a "rude and discourteous manner." R.22, Ex.13 at 2. Mr. Lucas details the days he was permitted to work on the machine and his efforts in securing more work for himself on the machine he preferred. After the complaint, the CTA's Affirmative Action Unit began its investigation, and, as part of this examination, a CTA investigator met with Blatz. The following day Blatz sent Mr. Lucas home. Mr. Lucas then amended his internal CTA complaint to allege retaliation by Blatz.

At the time, Mr. Lucas claimed that Blatz sent him home without an explanation. More recently, in his November 27, 2002 deposition, Mr. Lucas testified that, when Blatz sent him home in September of 1997, Blatz stated: "If you don't like it here, nigger, go home." R.28-1, Ex.13 at 70. Additionally, Mr. Lucas' more recent submissions allege that his supervisors repeatedly used racial slurs and the "N word." Specifically, in his January 2003 affidavit, Mr. Lucas states that Blatz used racial slurs toward him in 1997.[2]

---

[2] The defendant correctly points out that Mr. Lucas did not allege any racial slurs in his 1997 complaint to the CTA. Mr. Lucas has not pointed to any complaint, grievance or correspondence between 1997 and 2002 that alleged racial comments, nor

(continued...)

Before the CTA completed its internal investigation, Mr. Lucas requested to work the daytime hours as a machine operator; this request was denied. Mr. Lucas then requested a transfer to another position so that he could work days to accommodate his family needs. Sometime around December 1, 1997, the CTA granted this second request by transferring Mr. Lucas back to his original track inspector position, a position in which he was no longer supervised by Blatz.

Following Mr. Lucas' transfer, on July 7, 1998, the CTA sent him a letter indicating its investigation supported a finding of cause on his race discrimination and retaliation claims against Blatz and Schriks. After a subsequent review by the Track Maintenance Department, however, CTA Vice President, Pat Harney, told Blatz and Schriks that he disagreed with the finding of cause and decided not to discipline either employee. Mr. Lucas asserts that he was aware of the finding of cause but not aware either that the finding was discredited upon review or that the managers were not disciplined in any way.

Mr. Lucas did not file a formal charge with the Equal Employment Opportunity Commission ("EEOC") or its corresponding state agency within 300 days of the 1997 incident. Mr. Lucas attributes his failure to the fact that the CTA communicated its finding of possible racial discrimination. Mr. Lucas thought he had exposed the injustice in the workplace and therefore accomplished what he set out to do. He maintains that he relied on the CTA's representa-

---

(...continued)
does the record reveal any specific complaint by Mr. Lucas available during the CTA's investigation. Mr. Lucas supports his assertion only by citing his November 2002 deposition and a January 2003 affidavit.

tions that it would investigate and resolve complaints. Had he known that the CTA had failed to take corrective action after its initial conclusion, he continues, he would have filed a charge with the EEOC.

### 2. 2001 EEOC Charge and Related Events

After his transfer in December 1997, Mr. Lucas again inspected and repaired track. As a result of this transfer, Mr. Lucas was not managed by, and had no contact with, Blatz from December 1, 1997, until January 18, 2001. Mr. Lucas admits that he was "no longer subject to Blatz's on-going racial harassment until Jan[.] 18, 2001." Appellant's Br. at 7.

In January 2001, Mr. Lucas and co-worker, Jose Quintana, stopped a CTA passenger train instead of walking to the nearest station, apparently, so they could get to lunch faster. Blatz coincidentally was riding the train that Mr. Lucas and Quintana stopped. Blatz reprimanded Mr. Lucas and Quintana by telling them not to stop trains unnecessarily in violation of CTA rules. He asserts that Mr. Lucas would not respond to his questions and, as a result, Blatz told Mr. Lucas he was "out of service" for his insubordination. Mr. Lucas, on the other hand, asserts that he promised not to stop trains in the future but said nothing more in order to avoid escalating the altercation. Blatz next allegedly grabbed Mr. Lucas' shoulder and bruised his neck. As a result of this altercation, Mr. Lucas called emergency paramedics and requested an ambulance, but upon their arrival the paramedics found no serious injuries that warranted their transporting Mr. Lucas to the hospital. Mr. Lucas next contacted the Chicago Police Department and filed a criminal complaint against Blatz for battery. This charge was later dismissed.

Mr. Lucas also filed an "Unusual Occurrence Report" with the CTA describing his version of the events. CTA General Manager of Power and Way Maintenance, Frank Machara, along with another employee, Fred Tijan, investigated the incident to determine what actually occurred. Mr. Lucas remained out of service during this investigation. Machara and Tijan, the Track Maintenance Manager, conducted interviews of several witnesses, including, Blatz, Quintana, Mr. Lucas' partner, and Carlos Flores, another employee who was at the scene and witnessed the altercation. After this investigation, Machara initially concluded that Mr. Lucas should be terminated because Mr. Lucas' accusations were incorrect and because the reports Mr. Lucas filed with the CTA and the police were false. Mr. Lucas admits that Machara determined that he had given a false account of the incident, which had resulted in Blatz's arrest for battery. After consulting with the CTA's Employee Relations Department, however, Machara decided to suspend Mr. Lucas for over twenty days, the length of the investigation.

Relying on these events as the basis for his claim, Mr. Lucas filed a charge of discrimination with the EEOC on February 1, 2001. Mr. Lucas filed a second charge with the EEOC on July 3, 2003, alleging retaliation for his first complaint.

### 3. Other 2001 Incidents

In addition to the 1997 and January 2001 incidents, Mr. Lucas detailed the following actions in his charge of discrimination and retaliation. First, Mr. Lucas alleges his supervisor, Roadmaster Emiliano Escorcia, discriminated against him by imposing discipline for going to the credit exchange during the hours of 7-9 a.m. Mr. Lucas contends that he was singled out for discipline while others were

permitted this liberty. In describing the discipline he received, Mr. Lucas stated that he was "written up," Appellant's Br. at 13, and he "alone was issued a caution and instruct [sic] by Escorcia to create a paper trail," Appellant's Reply Br. at 15.[3]

Next, Mr. Lucas asserts he and his co-worker Quintana were given written warnings for returning late from lunch when other employees were not similarly disciplined. Mr. Lucas offered, as an example, Francisco Garcia, a co-worker, who went and arrived back from lunch at the same times, but who was not similarly disciplined. In his reply brief, Mr. Lucas explained that he was docked thirty minutes of pay for this incident.

---

[3] The single page of a deposition transcript, R.28-1, Ex.13 at 134, cited in his reply brief contains no support for his laconic description of the discipline. This practice of citation continues throughout Mr. Lucas' brief. We note at this point that, although this case comes to us after the trial court granted the defendant's motion for summary judgment, and we therefore must construe all facts in the light most favorable to the non-moving party, *see Bellaver*, 200 F.3d at 491-92, Mr. Lucas has made this task particularly difficult. First, his presentation of the facts are in the form of an argument, often without proper citation. *See* Cir. R. 28(c) ("The statement of the facts required . . . shall be a fair summary without argument or comment."); *Palmquist v. Selvik*, 111 F.3d 1332, 1337 (7th Cir. 1997); *see also L.S.F. Transp., Inc. v. N.L.R.B.*, 282 F.3d 972, 975-76 n.1 (7th Cir. 2002) (noting that Circuit Rule 28(c) is "essential to meaningful judicial review" and cautioning counsel that violations could lead to the brief being stricken or summary affirmance, in addition to other sanctions). Further, as defendant correctly points out, the "Plaintiff's approach in this case has been to present his claims non-chronologically, often without reference to time or dates, and without discernable logical flow." Appellee's Br. at 18. This practice also does not aid plaintiff in demonstrating whether his claims are meritorious or not.

In a third event, Mr. Lucas asserts he was singled out for refusing to go onto the tracks to remove a "pushcart" during the rush-hour period while others were not disciplined for also refusing the order. Mr. Lucas explains that CTA employees were instructed not to enter the tracks during rush hour unless there was an emergency. Therefore, when Mr. Lucas and three other employees were asked to remove the cart, no one complied. Mr. Lucas does not contest that he was the only employee who called this order "stupid and idiotic." R.20 ¶ 109; R.26 ¶ 109. After a Track Maintenance Department investigation of the matter, Mr. Lucas was suspended for one day for showing disrespect.

Finally, Mr. Lucas asserts that there also was evidence of a racially hostile working environment. Mr. Lucas does not provide dates or even a time frame in his appellate brief indicating when many of the statements occurred. In Mr. Lucas' statement of uncontested facts before the district court, he indicated that his supervisor, Escorcia, "regularly demeaned African-Americans with comments and slavery gestures" from 1999 through 2002. R.28-1, Ex.11 ¶ 8. Mr. Lucas quotes a few of Escorcia's alleged racial slurs, only noting that the slurs and gestures were "common phrase[s]." R.28-1, Ex.13 at 92. Mr. Lucas also contends that African-Americans were asked to work longer sections of the track and were written up for reasons for which non-African-Americans were not written up. Mr. Lucas offers, as an undated example, an African-American worker who was asked to go into a tunnel without a flashlight when non-African-Americans were not so required. Finally, Mr. Lucas contends, further evidence of a hostile work environment is Escorcia's discipline of Mr. Lucas after he refused Escorcia's order to remove the pushcart from the tracks.

## B. District Court Proceedings

On September 13, 2001, Mr. Lucas filed his complaint. The CTA asserted that Mr. Lucas' claims were barred by the statute of limitations, and it moved for summary judgment shortly thereafter. The CTA subsequently filed a motion to strike much of the statement of facts that Mr. Lucas had submitted in response to its summary judgment motion. The district court granted, in part, the motion to strike and also granted the motion for summary judgment.

The district court first addressed whether Mr. Lucas' 1997 claims were time-barred. The court noted that Mr. Lucas had filed his EEOC charge on February 1, 2001, well outside of the 300-day time requirement for filing a charge of discrimination. The court then addressed Mr. Lucas' argument that his claims were saved by equitable estoppel or the continuing violation doctrine. The court reiterated that equitable estoppel applies only in situations in which a defendant takes active steps to prevent a plaintiff from suing on time. The court found that the CTA had not taken any steps to prevent Mr. Lucas from filing on time and that the CTA actually had advised Mr. Lucas that he might have a valid claim.

The court also rejected Mr. Lucas' continuous violation argument for two reasons. First, the district court found that Mr. Lucas had acknowledged that the past acts were sufficiently severe to constitute a discrete act, and discrete acts must be filed within the limitations period. The court pointed to Mr. Lucas' acknowledgment that he had told his manager in 1999 that he was the victim of discrimination but had decided not to file a legal claim. Second, the court determined that Mr. Lucas was transferred away from Blatz in 1997 and did not have any contact with him until 2001.

The district court next addressed Mr. Lucas' claims that he was disciplined in a discriminatory manner. The district

court found that Mr. Lucas could not come forward with evidence that similarly situated non-African-American employees were treated less severely. The court first addressed Mr. Lucas' discipline for returning late from lunch; according to the court, the record indicated that Escorcia wrote up both Mr. Lucas and Lucas' Hispanic partner, Quintana, for returning late. The court then addressed the January 18 train incident and related discipline. It found that Mr. Lucas had failed to come forward with any evidence that another CTA employee had filed a false police report against a fellow employee, but had not been punished. Finally, the court dismissed Mr. Lucas' contention that he was subject to improper discipline after refusing to obey a supervisor's order. The court found that Mr. Lucas had called the direction of his superior "stupid and idiotic"; however, Mr. Lucas had failed to offer evidence of another employee who had engaged in similar conduct without being subject to discharge. The court therefore granted CTA's motion for summary judgment.

Finally, the district court addressed, and ultimately granted, the CTA's motion to strike the allegations that Mr. Lucas' supervisor, Escorcia, regularly demeaned African-American employees or discriminated against Mr. Lucas. The court found that Mr. Lucas "provided no support for his general statements as to such comments, such as time, place, and who was present." R.37 at 9. Accordingly, the court could not assess whether the statements fell within the statute of limitations period or not. The court struck Mr. Lucas' "statements of uncontested facts with regard to Escorcia's alleged comments for lack of foundation." *Id.*

## II

## DISCUSSION

We review the district court's grant of summary judgment de novo, "viewing all of the facts and drawing all rea-

sonable inferences therefrom in favor of" Mr. Lucas, the non-moving party. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir.); *see Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir.), *cert. denied*, 537 U.S. 820 (2002). Summary judgment should be granted only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The decision of the district court to strike several factual allegations because they were without foundation or support is an evidentiary ruling that is reviewed under a deferential abuse of discretion standard even on a motion for summary judgment. *See Bradley v. Work*, 154 F.3d 704, 708-09 (7th Cir. 1998); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 744 (7th Cir. 1997).

We first turn to whether the 1997 claims are barred by the statute of limitations and then address the remaining clams.

### A. 1997 Claims

"Section 2000e-5(e)(1) requires that a Title VII plaintiff file a charge with the Equal Employment Opportunity Commission (EEOC) either 180 or 300 days 'after the alleged unlawful employment practice occurred.' " *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002) (citing 42 U.S.C. § 2000e-5); *see Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999); *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 750 (7th Cir. 1995). Mr. Lucas filed his first charge of discrimination with the EEOC on February 1, 2001. Accordingly, the CTA contends that any claim before April 1, 2000 (300 days before Mr. Lucas' first EEOC charge) is time-barred unless Mr. Lucas can demonstrate an

exception to this limitations period.[4] Mr. Lucas offers two theories to avoid this result and to reach claims prior to April of 2000.

### 1. Equitable Estoppel

Mr. Lucas first contends that the CTA's secret rejection of the initial discrimination finding equitably estops the CTA from employing the statute of limitations as a defense. Mr. Lucas explains that he relied upon the CTA's communications and its finding of cause for discrimination. He asserts that the CTA claimed it investigated and resolved the discrimination claims but then allowed higher management to disregard the findings regarding his claim. Mr. Lucas characterizes this review process as "nothing but a deliberate, misleading illusion to employees." Appellant's Br. at 18. According to Mr. Lucas, CTA management's disregard of the initial internal finding of discrimination justifies the application of equitable estoppel.

### a. legal framework

Equitable estoppel will operate as a bar to the defense of statute of limitations if "the defendant t[ook] active steps to prevent the plaintiff from suing in time, such as by hiding evidence or promising not to plead the statute of limitations." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995) (internal citations omitted); *see Soiginer v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 554 (7th Cir. 1996); *Cada v.*

---

[4] Mr. Lucas concedes that, if this court does not accept his equitable estoppel or continuing violation arguments, he is limited to recovering for only those actions that occurred after April 1, 2000.

*Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). However, Mr. Lucas does not allege that the CTA somehow prevented him from suing or that it promised not to plead the limitations as a defense. He only contends that he would have filed his claim if the CTA had not misled him into thinking the internal review would remedy the situation. Mr. Lucas' hope that internal review would resolve his complaint in a manner he desired is not the type of claim that equitable estoppel is designed to address.

Our resolution of Mr. Lucas' claim is guided by the decision of the Supreme Court in *Delaware State College v. Ricks*, 449 U.S. 250 (1980), and our subsequent case law interpreting *Ricks. See Lever v. Northwestern Univ.*, 979 F.2d 552, 556 (7th Cir. 1992) (noting that to treat the opportunities of internal review as a source of equitable estoppel would reverse the Court's conclusion in *Ricks*); *Soignier*, 92 F.3d at 554. In *Ricks*, the Court reiterated that the limitations period begins to run when the discrimination occurs. It further determined that the "pendency of a grievance, or some other method of collateral review of an employment decision does not toll the running of the limitations periods." *Ricks*, 449 U.S. at 261. The existence of these internal procedures, the Court explained, does "not obscure the principle that limitations periods normally commence when the" discriminatory act occurs. *Id.*

In *Lever v. Northwestern University*, the plaintiff attempted to pursue claims outside the 300-day limitations period by characterizing the internal review process as a "snare[ ] for the unwary" that kept her from filing with the EEOC in time. *Lever*, 979 F.2d at 556. The defendant university offered many channels of internal review through which a professor could attempt to persuade school officials to change their employment decisions. Lever pursued these procedures without success and without filing a charge with

the EEOC within the limitations period.[5] We rejected Lever's claim that these multiple and varied opportunities for internal review were the type of deception that could support equitable estoppel. *See Lever,* 979 F.2d at 556 ("Excessive kindness in providing many and varied opportunities for internal review is not the sort of deception that supports equitable estoppel."). We noted that "[t]o treat such opportunities as a source of equitable estoppel would reverse the Court's conclusion in *Ricks* . . . that appeals and requests for reconsideration do not permit delay." *Id.*

We held similarly in *Soignier v. American Board of Plastic Surgery.* In that case, the plaintiff alleged that his internal review was delayed until the last day of the month in which he could file an EEOC charge and that his employer only explained the internal review process without informing him of the option of filing a lawsuit. *Soignier,* 92 F.3d at 554. This court held that neither act supported equitable estoppel. *Id.* Specifically, with respect to the contention that internal appeals should toll the statute of limitations, we determined that permitting internal review to delay the statute of limitations would be contrary to *Ricks*:

> An employee's pursuit of an internal grievance procedure does not affect the date on which his claim accrued. Unlike an EEOC investigation . . . , internal appeals are not part of the . . . statutory procedure and do not toll the time for filing suit. . . . His internal

---

[5]   Lever was an assistant professor who was notified by the Dean of the College that she would not be recommended for promotion. The dean then subsequently received further evidence and reviewed his initial decision several times. The dean did not reverse his decision, and an internal panel agreed to hear Lever's appeal of the dean's decision. As a result, Lever delayed filing her complaint.

> appeal was only an added forum—an opportunity to get two bites at the apple.

*Id.* Internal review was not, therefore, an act that implicated equitable estoppel.

### b. application

As we have stated, to invoke equitable estoppel, the plaintiff must demonstrate that the defendant took "active steps to prevent the plaintiff from suing in time." *Cada*, 920 F.2d at 450-51. Our decisions clearly demonstrate that merely providing internal review, as in the present situation, is not the type of active step that warrants the application of equitable estoppel. Mr. Lucas chose to trust that the internal review process would resolve his complaint to his satisfaction without following through to see that the desired result was actually achieved. His lack of satisfaction does not equate to an affirmative concealment on the part of the CTA.

That the CTA's actions do not warrant application of equitable estoppel finds further support in the correspondence between the parties. The only action the CTA took was to inform Mr. Lucas the internal investigation supported a finding of cause on Mr. Lucas' race discrimination and retaliation claims against Blatz and Schriks. The letter sent by the CTA stated that "the evidence supported a finding of race discrimination and retaliation" and that the "Affirmative Action Unit will make various recommendations to the Vice President of Engineering and Construction." R.28-1, Ex.1. Contrary to hiding or destroying evidence, the CTA stated that the evidence *supported* a claim. Further, the CTA only promised to make *recommendations* to the Vice President of Engineering. It appears uncontested that the CTA did just that. The evidence

indicates that the CTA Vice President disagreed with the investigation and decided not to discipline Blatz or Schriks. At no time did the CTA hide evidence helpful to Mr. Lucas' discrimination claim; the CTA only informed Mr. Lucas of their findings in his favor and that they would make "recommendations" to management. The letter actually alerted Mr. Lucas to his potentially meritorious claim and did not amount to active steps preventing a plaintiff from filing a claim within the limitations period.

Finally, Mr. Lucas asserts that the CTA's failure to inform him that the findings had been reversed by management qualifies as an act that implicates the doctrine of equitable estoppel. Mr. Lucas explains that he did not learn that the CTA disregarded the findings of the investigation until May 28, 2002. He therefore contends that he did not learn of his injury until this time. The proper focus, however, is when Mr. Lucas discovered the *discriminatory act* that violated the applicable statute and not when Mr. Lucas discovered some other act that was not itself the subject of a violation. *See Ricks*, 449 U.S. at 258 ("[T]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." (quoting *Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979) (emphasis added))).[6] As we have explained, "[a]n employer's refusal to undo a discriminatory decision is not a fresh act of discrimination." *Lever*, 979 F.2d at 552. The fact that the CTA disregarded the initial finding of cause upon review is not alleged to be a discriminatory violation of Title

---

[6] In *Delaware State College v. Ricks*, 449 U.S. 250 (1980), the discriminatory act was the denial of tenure and the Court held that the subsequent lawful termination should not be the starting point for the statute of limitations. *Id.* at 257-58; *Chardon v. Fernandez*, 454 U.S. 6, 7-8 (1981) (per curiam).

VII, but the alleged discriminatory act occurred, and was discovered, in 1997 before Mr. Lucas even filed his internal complaint. Mr. Lucas' equitable estoppel argument fails, and we now turn to whether the continuing violation doctrine will save his otherwise time-barred claims.

### 2. Continuing Violation

Mr. Lucas next contends that his 1997 Title VII claims should be treated as a single continuing violation. He explains that "it would have been unreasonable for Mr. Lucas to sue given the EEO Department's findings. Mr. Lucas was told the racial discrimination had been resolved." Appellant's Br. at 19.

### a. case law

In *National Railroad Passenger Corp. v. Morgan*, the Supreme Court explained when a plaintiff may rely on the continuing violation doctrine to recover for discriminatory acts that fall outside the 300-day limitations period. The doctrine operates differently according to the type of discriminatory act alleged—-"discrete" discriminatory acts or acts contributing to a hostile work environment. *Morgan*, 536 U.S. at 114-15. With respect to the first category—"discrete" acts—each act "starts a new clock for filing charges," and the clock starts on the date that the act "occurred*." Id.* at 113. Any discrete discriminatory acts that fall outside the statute of limitations are time-barred even though they may relate to other discrete acts that fall within the statute of limitations. *See id.* at 112-13. Similarly, timely filed discrete acts cannot save discrete acts that are related but not timely filed. *See id.* at 112 ("[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time

period."). The Court provided further guidance with respect to application of the continuing violation doctrine by giving specific examples of discrete acts "such as termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114. The Court noted that these acts "are easy to identify" because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' " *Id.*

However, as noted above, the Court in *Morgan* distinguished "discrete" acts from a second category of acts, those contributing to a hostile work environment. The Court explained that the "very nature" of hostile work environment claims involves "repeated conduct" that "may not be actionable on its own." *Id.* at 115. Rather, "[s]uch claims are based on the cumulative effect of individual acts." *Id.* In contrast to discrete acts of discrimination,

> [i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* at 117; *see also Hildebrandt v. Illinois Dept. of Nat. Res.*, 347 F.3d 1014, 1027 (7th Cir. 2003). The Court reasoned that the "incidents constituting a hostile work environment are part of one unlawful employment practice." *Morgan*, 536 U.S. at 118.

### b.  discrete acts

Applying the framework set forth in *Morgan* to Mr. Lucas' claims, we believe that at least some of the allegedly

discriminatory acts identified by Mr. Lucas are "discrete" acts, and therefore claims based on these acts cannot be rendered timely by application of the continuing violation doctrine. For instance, Mr. Lucas' claim that, in 1997, Blatz sent him home without pay in retaliation for filing his internal grievance is a discrete act. Because it occurred prior to April 1, 2000, 300 days prior to Mr. Lucas' filing, it is not actionable. Other discrete acts that were actionable standing alone were the CTA's decision to suspend Mr. Lucas for one day after he refused Escorcia's order to enter the track and his twenty-two-day suspension in January 2001. These discrete acts fell within the limitations period and are addressed separately below.

### c. hostile environment

In addition to discrete acts, Mr. Lucas also maintains that he endured hostile harassment from 1997 forward. We set forth the incidents that allegedly form a hostile environment claim, keeping in mind the Court's instruction in *Morgan* that our task "is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice." *Id.* at 120. If we conclude that they are part of the same hostile work environment practice, then, we must determine "whether any act falls within the statutory period." *Id.* Without a hostile act within the limitations period, we cannot consider component hostile acts that occurred outside the limitations period. *See id.*

We are hindered in our efforts in assessing Mr. Lucas' claim, however, by his failure to point to the specific actions that he believes contributed to a hostile work environment claim. In addressing the continuing violation doctrine, Mr. Lucas only submits that "[i]t would have been unreasonable

for Lucas to sue given the EEO Department's findings. Lucas was told the racial discrimination had been resolved." Appellant's Br. at 19. This laconic contention does not demonstrate a hostile work environment. We therefore look to the remainder of Mr. Lucas' brief to assess whether he may have a hostile work environment claim that merits the inclusion of otherwise barred actions. However, even there, Mr. Lucas makes only two references to his hostile work environment claim. The first is based on his assertion that "Blatz had previously retaliated against Lucas in October of 1997" and that the Affirmative Action Unit found cause for discrimination but failed to discipline Blatz. Appellant's Br. at 28. Mr. Lucas therefore concluded that "a jury could reasonably find that Blatz retaliated, discriminated and maintained a hostile work environment against Lucas on Jan[.] 18, 2002." *Id.* Mr. Lucas also contends that on June 29, 2001, "[t]he CTA's discipline of Mr. Lucas for speaking up to challenge Escorcia's . . . order to violate CTA safety rules was a clear example of racial discrimination and is an aspect of Mr. Lucas' hostile work environment." *Id.* at 30.

Although Mr. Lucas' brief attempt to invoke the principles of the continuing violation doctrine well might warrant the application of forfeiture principles,[7] even a charitable review of the entire record reveals that the continuing violation doctrine is inapplicable. The record reveals that Mr. Lucas asserted in his statement of uncontested facts before the district court that, when he addressed Blatz as "Sir," Blatz would respond to Mr. Lucas as "asshole." R.27 ¶¶ 1-3. Mr. Lucas also offered testimony of an experienced employee who said Blatz treated African-Americans with disrespect

---

[7] *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990).

and, consequently, the work environment was hostile. Mr. Lucas further contended that Blatz allowed him to work on the Tie Inserter/Extractor machine only two times despite Mr. Lucas' high test score. Finally, Mr. Lucas maintains that, in 1997, Blatz wrote on a railroad tie that "Lucas is a dumb nigger." R.27 ¶ 29. However, the acts set forth above, which all occurred outside the limitations period, cannot be considered unless Mr. Lucas can point to an act that is part of the same hostile work environment and that falls within the limitations period.

Mr. Lucas attempts to fulfill this requirement by pointing to various actions that occurred after 1997. However, many of these incidents are nothing more than undated, unspecific assertions. First, Mr. Lucas asserts that Escorcia used racial slurs and that "racial slurs were commonly used in the workplace." Appellant's Br. at 14. Mr. Lucas also offered deposition testimony from a co-worker who asserted that Escorcia treated African-Americans "more harshly than non African-Americans." *Id.* Mr. Lucas also claims (1) that African-Americans were asked to change the rail ties more frequently; (2) that Escorcia wrote an African-American employee up for his first time being thirty minutes late to work while other non-African-Americans were not written up their first time; (3) that Escorcia ordered an African-American employee, McGee, to enter a tunnel without a flashlight, a dangerous undertaking with the electrified, high-voltage rail; and (4) that Escorcia finally gave McGee an inadequate flashlight of lower intensity than the flash-lights given to non-African-Americans.

Although the above actions could possibly support Mr. Lucas' hostile environment claim, there must be evidence in the record from which a trier of fact could conclude that the acts were committed after April 1, 2000, within the lim-itations period. First, we address Escorcia's comments and racial slurs.

The evidence concerning Escorcia's actions was the subject of the CTA's motion to strike, which was granted by the district court. The district court explicitly held that Mr. Lucas failed to provide support for his general allegations against Escorcia. The court specifically noted that the allegations did not contain the time, place of the actions, nor did the allegations specify who was present. Therefore, the court could not determine whether Escorcia's comments occurred within the limitations period. The court accordingly granted the CTA's motion to strike Mr. Lucas' general allegations of Escorcia's racial statements. As we previously noted, we review the decision of the district court to strike such allegations for an abuse of discretion. *See Bradley v. Work*, 154 F.3d 704, 708-09 (7th Cir. 1998); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 744 (7th Cir. 1997). However, because Mr. Lucas offers no argument as to why the district court's decision was erroneous, he has waived any argument as to Escorcia's comments.[8]

However, assuming arguendo that Mr. Lucas has not waived his objection to this decision, the district court did not abuse its discretion in excluding Escorcia's statements. Mr. Lucas proffered his affidavit that stated Escorcia treated African-Americans "more harshly." He asserts that African-Americans were asked to change rail ties more frequently,

---

[8] The district court granted, in part, the defendant's motion to strike, but was less than precise in stating what it had stricken. R.37 at 9. The court referred to Mr. Lucas' allegations that Escorcia regularly demeaned African-Americans. The court granted the plaintiff's motion "to strike Lucas['] additional statements of uncontested facts with regard to Escorcia's alleged comments for lack of foundation." *Id.* The court apparently struck all the statements allegedly made by Escorcia that were not supported by time or other detail.

work longer sections of the track and were written up for reasons that non-African-Americans were not. *See* Appellant's Br. at 14-15. Mr. Lucas does not set forth any of the times, dates or places which led to these conclusions. We repeatedly have held that conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of truth of the matter asserted." *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (citations omitted).[9] Consequently, without specific instances of support, we cannot consider Mr. Lucas' assertions in support of his hostile work environment claim.

Excluding the unsupported claims of racially derogatory statements by Escorcia, we are left with only discrete

---

[9] In *Drake v. Minnesota Mining & Manufacturing Co.*, the plaintiff offered an affidavit statement that every time the plaintiff or another African-American employee complained about an employee who was white, the employer would not investigate the allegations against white employees. We determined that this was "exactly the type of conclusory allegations that Rule 56 counsels should be disregarded." 134 F.3d 878, 887 (7th Cir. 1998). Likewise, conclusory allegations that African-Americans had to do more work and received the tougher assignments cannot support a claim of harassment.

acts[10] and Mr. Lucas' encounter with Blatz in January 2001 on the commuter train. With regard to the train incident with Blatz, we accept as true Mr. Lucas' version that Blatz yelled at and physically grabbed him. These actions on January 18, however, were not connected to any 1997 hostile work environment. The altercation in 2001 occurred long after 1997 with no incidents during the intervening years. We believe that this chance meeting over three years later stretches the application of a continuing violation theory beyond any workable limit; it simply cannot be considered part of the same hostile environment practice. Blatz was no longer Mr. Lucas' supervisor and had not supervised Lucas since 1997.

We have stated that "[t]he concept of *cumulation* suggests a critical limiting principle. Acts . . . so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations." *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002) (quoting *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996), and noting that *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) abrogated *Galloway* on other grounds). In *Tinner*, for ex-

---

[10] These discrete acts previously mentioned involve Mr. Lucas' suspensions. Specifically, Machara suspended Mr. Lucas for filing a false report after the January 2001 train incident with Blatz. Mr. Lucas also was disciplined after visiting the credit exchange, returning late from lunch, and in June 2001 the CTA suspended him after he had disobeyed and called an order from Escorcia "stupid and idiotic." R.20 ¶ 109; R.26 ¶ 109.

ample, we reviewed our precedent and determined that an eight-year gap between discriminatory incidents could not constitute a single hostile work environment claim. *Tinner* in turn relied upon *Selan v. Kiley*, 969 F.2d 560, 566-67 (7th Cir. 1992). In this earlier case, we "held that a two-year gap between alleged discriminatory acts could not support a continuing violation claim." *Tinner*, 308 F.3d at 708-09. This court in *Selan* held that the almost two-year separation was "considerable" and "weigh[ed] heavily against finding a continuing violation." *Selan*, 969 F.2d at 567.

The gap between alleged hostile acts in Mr. Lucas' claim, exceeding three years, was even greater than the two-year gap in *Selan*. Although a brief passage of time will not defeat automatically the application of the continuing violation doctrine, we must conclude that the approximate three-year gap between the discriminatory acts alleged, with the last act occurring entirely by happenstance, was not part of the same hostile work environment. Thus, Mr. Lucas puts forth no evidence of a discriminatory act during the limitations period that contributed to a hostile work environment. Accordingly, the 1997 claims are time-barred.[11]

---

[11] Although we do not consider it necessary to decide this point, the defendant also contends that any hostile acts in 1997 were waived by Mr. Lucas. Its argument is not without merit. The Court in *Morgan* expressly left open the possibility of an employer's use of equitable defenses. The record confirms that Mr. Lucas admitted that as of August 1997 he believed that Blatz's use of racial slurs created a hostile working environment. Mr. Lucas further acknowledged that he told his manager in 1999 that

(continued...)

### B. Claims Filed Within the Limitations Period

Now that we have determined that the 1997 claims are time-barred, we turn to Mr. Lucas' discrete claims of discrimination that fell within the limitations period in order to determine whether he has set forth a prima facie case of discrimination.

---

(...continued)
he believed his work environment in 1997 was "'hostile,' but that he did not wish to pursue his legal case against CTA any further." R.20 ¶ 49; R.26 ¶ 49.

Mr. Lucas may provide direct[12] evidence of discrimination or he can rely on the indirect burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), *cert. denied*, 123 S. Ct. 79 (2003). Ordinarily, to establish a prima facie case of discriminatory discipline based on indirect evidence Mr. Lucas must demonstrate that (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered adverse employment action; and (4) the employer treated similarly situated

---

[12] Mr. Lucas alleges statements by CTA's counsel calling Mr. Lucas a derogatory name and asserting that the CTA was "out to get Lucas" are direct evidence of discrimination. The statements were allegedly made by CTA counsel, Eric Mennel, prior to a deposition for the present litigation. The CTA claims that the affiant, Garza, stated to Mennel that Mr. Lucas was out to "get money" from his suit. The attorney then responded that the CTA would not give Lucas any money and would go to trial if necessary and "get 'em." R.31 ¶ 160. The CTA explains the comment was referring to winning the case Mr. Lucas brought. *See* Appellee's Br. at 35; R.31 ¶ 160. Mr. Lucas states only that Mennel "referred to Lucas as an asshole and told Garza that, 'The CTA was out to get Lucas.' " Appellant's Br. at 14; R.28-2, Ex.40, Garza Aff. ¶¶ 4, 5.

Even if these statements were made as asserted, it is not direct evidence of discrimination. Direct evidence of discrimination is evidence that, without reference or explanation, ties the illicit motive with the adverse employment action. In the present case, the statements were not made by a decision maker nor did they concern an adverse employment action. *See Williams v. Seniff*, 342 F.3d 774, 790 (7th Cir. 2003); *Fyfe v. City of Ft. Wayne*, 241 F.3d 597, 602 (7th Cir. 2001). Accordingly, neither statement is direct evidence of discrimination, although they may be probative indirect evidence of discrimination.

employees outside of the protected class more favorably. *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002). To the extent that the plaintiff claims that he was subject to disparate punishment, as Mr. Lucas does here, the second and fourth prongs of *McDonnell Douglas* merge. *See Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999). In those situations, there is no question that the employee failed to meet his employer's expectations. Instead, the plaintiff must establish that he received dissimilar—and more harsh—punishment than that received by a similarly situated employee who was outside the protected class. *See Grayson*, 308 F.3d at 817; *Flores*, 182 F.3d at 515.

If Mr. Lucas meets his initial burden, the burden of production shifts to the CTA to articulate a legitimate non-discriminatory reason for its action. If the CTA comes forward with a legitimate, non-discriminatory reason for its action, the burden shifts back to Mr. Lucas to demonstrate the reason offered was pretextual. *See Peters*, 307 F.3d at 545. Mr. Lucas alleges several acts of discrimination, and we now address each in turn.

### 1. Train Incident Suspension

The facts are undisputed that Machara conducted an investigation and concluded that Mr. Lucas filed a false report that led to Blatz's arrest and charges of battery. As a result of this finding, Machara recommended that Mr. Lucas be terminated. However, the Employee Relations Department recommended that Mr. Lucas only be suspended. Machara accepted this recommendation and converted the

discharge into a suspension. *Id.* Machara suspended Mr. Lucas for twenty-two days as a result of the January 18 incident.[13]

Mr. Lucas is a member of a protected class and suffered an adverse employment action, suspension of twenty-two days. Therefore, the critical element remaining for Mr. Lucas to prove is that similarly situated employees received less severe punishment. Mr. Lucas does not identify any other employee who falsified a report or document, nor does Mr. Lucas identify any employee who had lied. Despite the admission that Machara made the suspension decision, Mr. Lucas maintains that Blatz made the decision to suspend him as part of an ongoing effort of discrimination. Mr. Lucas contends that Blatz and Machara did not suspend him for lying and filing a false report, but suspended him for stopping the CTA train and remaining quiet. *See* Appellant's Br. at 8-9, 16, 20, 23.[14] Mr. Lucas claimed that Blatz

---

[13] Mr. Lucas asserts he was suspended for 24 days. R.20 ¶ 96; R.26 ¶ 96.

[14] As support, Mr. Lucas offers two pieces of evidence on appeal. Mr. Lucas first cites to a deposition transcript where Blatz recounted the events of January 18, 2001. Blatz testified that he told Mr. Lucas he was out of service. Mr. Lucas also cites a letter from Machara explaining the suspension to a union representative. Machara explained in the letter that "[o]n Thursday, January 18, 2001, Mr. Lucas was taken out of service by Senior Roadmaster James Blatz for insubordination. . . . Mr. Lucas made several allegations of physical violence against him by Mr. Blatz and requested police and medical attention." R.28-2, Ex.48. This letter goes on to explain that "[o]n Friday, January 19, 2001[,] during a hearing at the West Shops, Mr. Lucas submitted an Unusual Occurrence Report accusing Mr. Blatz of assaulting him. . . . Because of the severity of the situation, Mr. Lucas was taken out

(continued...)

initially told him not to stop the trains and asked whether he understood this statement. Mr. Lucas responded by stating he would no longer stop the trains, but subsequently remained quiet and refused to answer Blatz's questions. Mr. Lucas asserts that Blatz continued to yell, but he remained silent in order to diffuse the situation. However, the statement of uncontested facts indicates that Machara determined Mr. Lucas gave a false report. Machara originally recommended termination, but, after consulting with the Employee Relations Department, Machara agreed to convert the termination into a suspension. Additionally, in his response to the CTA's statement of uncontested material facts, Mr. Lucas does not deny that Machara suspended him but only denies that his suspension was for twenty-two days when it was actually for twenty-four. The CTA stated that "Machara suspended Plaintiff for 22 days as a result of the incident that occurred on January 18, 2001." R.20 ¶ 96. Mr. Lucas responded: "Denies. The suspension was for 24

---

(...continued)

of service pending the results of a full investigation." *Id.* The investigation was completed on January 26 and a hearing was scheduled for January 31.

Even this evidence, offered in an attempt to avoid his previously noted admission that Machara made the decision to fire him based on a false report, does not demonstrate that Blatz suspended Mr. Lucas. Taken in context, the evidence offered demonstrates Blatz may have initiated the process by taking Mr. Lucas "out of service" that day. However, on the following day, Mr. Lucas submitted his report on the events, and it is undisputed that Machara then took Mr. Lucas out of service pending an investigation into the assault charges. This evidence does not alter the fact that Mr. Lucas has admitted Machara suspended him based on the finding that he had filed false reports about the incident.

days." R.26 ¶ 96. Further, in his appellate brief, Mr. Lucas contends that "[t]he Court wholly ignored Blatz's acts of discrimination and retaliation alleged in the complaint and focused instead on *Machara's decision* to suspend Mr. Lucas at the hearing." Appellant's Br. at 8 (emphasis added).[15]

As we have demonstrated at some length, the defendant asserts and Mr. Lucas admits that Machara suspended him because of Mr. Lucas' filing a false report and not merely because Mr. Lucas had stopped the train.[16] Mr. Lucas' failure to put forth any similarly situated employee is fatal to his claim.

Nor can Mr. Lucas argue that Blatz's racial animus was the basis for Machara's conclusion that Mr. Lucas lied in the report he filed. Generally speaking, comments by a non-decision maker do not suffice as evidence of discriminatory intent. *See Williams v. Seniff*, 342 F.3d 774, 790 (7th Cir. 2003)

---

[15] At oral argument counsel for Mr. Lucas also asserted that "at the time of the decision that Machara made," Machara did not have enough information to determine the report was false.

[16] Even assuming Mr. Lucas' asserted reasons for the suspension—stopping a train between stations and remaining silent—were accepted, his discrimination claim is still untenable in light of the fact that Mr. Lucas never points to any specific person outside the protected class who also stopped a train or committed a similar rules infraction and did not get suspended or reprimanded. He does provide general statements that no one had been suspended for this conduct. These statements neither inform us as to whether these individuals were members of a protected class, nor describe the situations in which the trains were stopped. His conclusory statements do not satisfy his burden to put forth a similarly situated employee who is directly comparable in all respects and was treated more favorably. *See Grayson v. O'Neill*, 308 F.3d 808, 818-19 (7th Cir. 2002).

(quoting *Gorence v. Eagle Foods Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)). However, we have cautioned that "[i]t is different when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000). If a person with racial animus "provides input" into the decision making process then, in some circumstances, "it may be possible to infer that the decision makers were influenced by those feelings in making their decision." *Id.* at 652-53.

Blatz did provide indirect input into the decision to suspend Mr. Lucas. He was one of the witnesses interviewed by Machara during the investigation. There are no facts, however, to support the conclusion that his allegedly racial animus influenced Machara's conclusion that Mr. Lucas had lied about the event. Blatz's statement was only one element of a comprehensive investigation into the event and into the veracity of Mr. Lucas' allegations. Tijan and Machara conducted an investigation of several witnesses; Blatz was not the only witness interviewed. Machara participated in interviews of Blatz, Quintana, who was Mr. Lucas' partner and boarded the train with him that day, and another CTA employee, Carlos Flores, who also witnessed part of the events. Not only was Blatz's participation limited to providing a statement, but the parties also agree that Machara and the investigators were unaware of Mr. Lucas' allegations stemming from the 1997 incidents. Relying on these witnesses and each party's statement, Machara and Tijan's report indicated, contrary to Mr. Lucas' statements, that Blatz only had put his hand upon Mr. Lucas' shoulder. Neither believed, after talking with the witnesses, that there was any hostility, and, therefore, both signed the report finding Mr. Lucas lied about the incident.

In sum, Mr. Lucas' submissions do not indicate the CTA's proffered reason for Mr. Lucas' discipline—that he filed a false report against Blatz—was a lie. Mr. Lucas, himself, admits that the false report was the reason Machara suspended Mr. Lucas. Mr. Lucas cannot show that the CTA's reason was "a dishonest explanation, a lie, rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). Mr. Lucas may believe that his suspension was incorrect, ill-advised, or undesirable; he has not established, however, that the CTA did not honestly believe that Mr. Lucas filed a false report that justified his suspension. *See Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001). Therefore, Mr. Lucas cannot rely on the January 2001 incident to establish discrimination.

### 2. Credit Exchange

Mr. Lucas next contends that he was the only employee disciplined for going to the credit exchange during the hours of 7-9 a.m. In explaining what discipline he received, Mr. Lucas merely asserts that he was "disciplined," Appellant's Br. at 12-13, and "written up," *id.* at 29-30. In response to the CTA's argument that Mr. Lucas failed to assert any adverse employment action, Mr. Lucas only elaborates in his reply brief that he "was issued a caution and instruct[ed] by Escorcia to create a paper trail" after going to the credit union. Appellant's Reply Br. at 15. However, at no point does Mr. Lucas indicate what the tangible consequences of the "write up" and "discipline" were.

Mr. Lucas fails to allege adequately any adverse employment action resulting from this "discipline." Our past decisions indicate that a negative evaluation or admonishment by an employer does not rise to the level of an adverse employment act. *See Sweeney v. West*, 149 F.3d 550, 556-57

(7th Cir. 1998) ("[N]egative performance evaluations, standing alone, cannot constitute an adverse employment action."); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (same). There must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action; otherwise every reprimand or attempt to counsel an employee could form the basis of a federal suit. *See Sweeny*, 149 F.3d at 557. Mr. Lucas failed to prove such a tangible consequence existed. Because Mr. Lucas failed to put forth the appropriate facts to demonstrate an adverse employment act regarding the discipline he received for visiting the credit exchange, his discrimination claim must fail.

### 3.  Returning Late from Lunch

Mr. Lucas next asserts that he "and his partner Jose Quintana were singled out for written warnings for returning late from lunch when co-workers were returning at the same time or later and they were not written up." Appellant's Br. at 13. Mr. Lucas continues to explain that "the evidence is that Francisco Garcia also returned late from lunch at the same time as Lucas[17] and Quintana but he was not written up by Escorcia." *Id.* Mr. Lucas concludes this argument by stating that the district court "ignored this evidence of different, adverse treatment of African-Americans." *Id.*

Even assuming these allegations are true, Mr. Lucas fails to meet his prima facie burden. First, Mr. Lucas failed to

---

[17] In his complaint, Mr. Lucas contends that he was not late returning from lunch, R.1 ¶ 42, but on appeal he asserts that he was singled out for returning late when others also were late, Appellant's Br. at 13 & 30.

explain in his opening brief that he suffered a tangible employment action as a result of his tardiness.[18] Second, Mr. Lucas failed to demonstrate that he was singled out for discipline on the basis of his race. Mr. Lucas identifies three people who, he asserts, were similarly situated in returning late from lunch. Mr. Lucas is an African-American, Quintana, who was also disciplined, is a Hispanic, and the third person, a person not disciplined and allegedly given better treatment, was Francisco Garcia. We are not told whether Francisco Garcia is also a member of a protected class; this fact is apparently not in the record.[19] It was incumbent upon Mr. Lucas to demonstrate that other similarly situated employees who were not members of the protected class were treated more favorably. *See Peters*, 307 F.3d at 546. All Mr. Lucas has demonstrated is that he and his Hispanic partner were both disciplined in a similar fashion and another individual of unknown race and ethnicity was not. Mr. Lucas, therefore, has not met his burden with respect to this element.

In his complaint, Mr. Lucas also alleged that his discipline for returning late from lunch was retaliation for filing his

---

[18] Although, Mr. Lucas did contend that he was docked pay several times in his pleadings to the district court, *see* R.1 ¶ 42; R.28-1, Ex.22 at 15; R.27 ¶ 125, he only asserted he was "written up" for the lunch incident in his opening appellate brief. It was not until his reply brief that Mr. Lucas asserted he was actually "docked 1/2 hour of pay." Appellant's Reply Br. at 13.

[19] See Fed. R. App. P. 28(a)(9)(A) (The argument must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). "A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (internal citations omitted).

discrimination claim. R.1 ¶ 43. However, he does not forward this argument on appeal. Although this argument is subject to waiver principles, we also dismiss Mr. Lucas' retaliation argument for similar reasons as his discrimination claim. To establish a prima facie case for retaliation under the indirect burden-shifting method, a plaintiff must demonstrate that "after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), *cert. denied*, 123 S. Ct. 79 (2003); *see Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir.), *cert. denied*, 537 U.S. 820 (2002).[20] Mr. Lucas admits that his partner, Quintana, who presumably did not file a discrimination complaint, also received similar discipline. *Stone* instructs, however, that the plaintiff has to demonstrate that "he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action." *Stone*, 281 F.3d at 644. Mr. Lucas did not satisfy the requirement set forth in *Stone*. Because Mr. Lucas waived his retaliation claim, and because he failed to meet the standards set forth in *Stone* to show that he was singled out for adverse employment action, his claim of retaliation was properly dismissed on summary judgment.

---

[20] Cf. *EEOC v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003). To recover for retaliation some courts have employed a test that requires the plaintiff to show "(1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity." *Id.*

### 4. Refusing the Order to Enter the Track

Mr. Lucas finally contends that he was singled out for discipline after refusing a June 29, 2001 order issued by Escorcia to remove the pushcart from the tracks during rush hour. Mr. Lucas maintains that the order was against CTA rules and that three other trackmen also refused to comply but were not similarly disciplined. The CTA asserts that Mr. Lucas was suspended for one day due to "disrespect to management" after Mr. Lucas told Escorcia the order was "stupid and idiotic." Mr. Lucas admits that he told Escorcia that his order was "stupid and idiotic" and that no other employee made a similar remark but nevertheless maintains that he was singled out for discipline on the basis of race. R.20 ¶ 109; R.26 ¶ 109; Appellant's Reply Br. at 14.

We previously have stated that

> in disciplinary cases—in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (internal citations omitted); *see Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). It is uncontested that Mr. Lucas was the only employee who made a comment disparaging the supervisor's order after refusing to comply. Mr. Lucas provides no

similarly situated employee who engaged in the same or similar type of conduct. Mr. Lucas has failed to meet his burden with respect to this allegedly discriminatory action.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*