**Linda RANDALL, Plaintiff,**

v.

**John E. POTTER, Postmaster General, United States Postal Service, Defendant.**

**No. CV–03–135–B–W.**

United States District Court, D. Maine.

Feb. 9, 2005.

---

Arthur J. Greif, Gilbert & Greif, P.A., Bangor, Martha S. Temple, Temple Law Offices, PA, Hampden, Julie D. Farr, Gilbert & Greif, P.A., Bangor, for Linda L Randall, Plaintiff.

David R. Collins, Office of the U.S. Attorney, District of Maine, Portland, for Postmaster General, Defendant.

## ORDER GRANTING DEFENDANT POSTMASTER GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

WOODCOCK, District Judge.

Claiming sexual harassment and a hostile work environment, Plaintiff Linda Randall has filed an action under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.* against the Postmaster General of the United States Postal Service ("Postal Service"). Ms. Randall alleges, *inter alia,* during the period from 1996 to 2001, she was sexually harassed by co-workers and a supervisor. The Postal Service moves for partial summary judgment on Ms. Randall's pre-October 2000 claims, arguing the claims are barred by the statute of limitations and to the extent the time-barred claims could survive as continuing violations, they are barred by the Postal Service's intervening action.[1] Concluding the Postal Service's intervening employment actions are sufficient under *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) to break the causal nexus between the within statute events and the out of

---

1. The Postal Service is not arguing conduct after October 2000 is subject to summary judgment. (Def.'s Reply to Pl.'s Opp'n to Def.'s Partial Mot. for Sum. J. at 1 (Docket # 33)).

time events, this Court GRANTS the Postal Service's Motion for Partial Summary Judgment.

## I. STATEMENT OF FACTS

In accordance with "conventional summary judgment praxis," this Court recounts the facts in a light most favorable to Ms. Randall's theory of the case consistent with record support.[2] *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 16 (1st Cir.2002). This Court has relied either on the uncontested facts or on Ms. Randall's version, if contested.

### A. Employment at the Hampden Facility: 1996—January 2000

Ms. Randall began working for the Postal Service in 1996. (Def.'s Statement of Undisputed Facts Including Material Facts (DSMF) ¶ 1 (Docket # 20)).[3] Her first position was as a mail handler at the Postal Service's Hampden facility; she worked on Tour 3 from 2:30 p.m. to 11:00 p.m.[4] (DSMF ¶ 1, Pl.'s Resp. to Def.'s Statement of Undisputed Facts and Statement of Additional Facts (PSMF) ¶ 1 (Docket # 23)). As a mail handler, she emptied equipment and brought mail to where it needed to go. (DSMF ¶ 1). Her supervisors were Donna Ransom and Paul Hendrickson. (DSMF ¶ 1, PSMF ¶ 1).

#### 1. 1996: Indecent Exposure

Ms. Randall alleges that, shortly after she began working for the Postal Service, Rick Defillipo, a co-worker, exposed his genitals to her. (DSMF ¶ 7). Mr. Defillipo was working "in empty equipment in the dock and [she] was walking through to go outside" when he told her to "come over." (DSMF ¶ 7). When she did, he exposed himself. (DSMF ¶ 7). Ms. Randall asserts that Ms. Ransom was present and knew of the incident. (DSMF ¶ 7). Ms. Randall did not, however, complain about the incident. (DSMF ¶ 7).

#### 2. 1996–97: Lewd Suggestion

During the holiday season in late 1996 or early 1997, Ms. Randall occasionally worked in the priority mail area. (DSMF ¶ 9). Once when they were throwing mail in the priority sacks, Brad McNally, a mail clerk, asked her to "sit between the sacks while he threw the mail and perform oral sex on him." (DSMF ¶ 9). Ms. Randall refused and left. (DSMF ¶ 9).

#### 3. 1997–99: Mr. McNally's Persistence

In 1997–1998, Ms. Randall worked in automation as a clerk and later as a flat sorter. (DSMF ¶ 12). Mr. McNally was an acting "204B" supervisor. (DSMF ¶¶ 10, 12 n.5). She worked with Dan Sickler, Joel Greenleaf, James Mercure, Randy Hooper, and Mark Fernald. (DSMF ¶ 12). Liz Walker supervised her most of the time, but occasionally Mr. McNally supervised her in his capacity as a temporary "204B" supervisor. (DSMF ¶ 12 n.5).

During her time in automation, Mr. McNally persistently harassed her. (DSMF ¶¶ 10–12) He would ask Ms. Randall what color underwear and bra she was wearing and if he could see her breasts. (DSMF ¶ 10). On one occasion,

---

2. Ms. Randall has filed a Motion to Strike. This Court has addressed the motion in a separate opinion.

3. The information contained in citations to "DSMF" have been admitted, in pertinent part, by Ms. Randall.

4. Ms. Randall began as a casual employee. She was hired as a transitional employee ("TE") and then worked again as a casual employee. She became a part-time flexible clerk ("PTF") and finally worked as a regular clerk.

Mr. McNally told two female clerks, Candy Sergi and Heather Buck, "to watch the machine because he wanted [Ms. Randall] to go out back so [they] could screw like dogs."[5] (DSMF ¶ 11). Ms. Sergi told Mr. McNally that was inappropriate. (DSMF ¶ 11). Nobody complained about Mr. McNally's comment at this time, and Ms. Randall did not tell any supervisor about the comment. (DSMF ¶ 11, PSMF ¶ 11).

Ms. Randall stated Mr. McNally made comments to her "[a]ll the time. Every day." (DSMF ¶ 11). He also told Ms. Randall his "girlfriend could get him off in two minutes" and wondered how long it would take Ms. Randall to do the same. (PSMF ¶ 40(f), DSMF ¶ 14). Mr. McNally told Ms. Randall, "I shouldn't say this. I shouldn't do this stuff. I know one of these days I am going to get caught." (DSMF ¶ 11). Ms. Randall told her supervisor, Mr. Fernald, Mr. McNally was a pig, but never put anything in writing. (DSMF ¶ 11 n.3).

When Ms. Randall began working as a Part Time Flexible ("PTF") employee in March 1999, she was transferred to Tour 2 where she worked primarily as a flat sorter. (DSMF ¶ 13). Mr. McNally was no longer Ms. Randall's supervisor, but she would see him for about thirty minutes in the morning during the change of shift. (DSMF ¶¶ 13, 14). According to Ms. Randall, Mr. McNally would make lewd comments, whisper in her ear, pull at her clothes, and try to look down her shirt. (PSMF ¶ 40(g), DSMF ¶ 14).

#### 4. January 2000: Mrs. Randall's Complaint

In January 2000, Ms. Randall continued working as a PTF on Tour 2, primarily as a flat sorter. (DSMF ¶ 15). Although Mr. McNally was not Ms. Randall's supervisor while she worked on Tour 2, during this time, she learned the Postal Service was considering Mr. McNally for promotion as manager of distribution operations ("MDO"). (DSMF ¶ 15). She told David Prescott, a union steward, Mr. McNally was a "pig" and what had happened. (DSMF ¶ 15). Mr. Prescott informed Louis Zedlitz, the plant manager. (DSMF ¶ 16). Mr. Prescott initially did not tell Mr. Zedlitz who had told him about Mr. McNally's conduct. (DSMF ¶ 16 n.9). Mr. Prescott asked Ms. Randall to write a statement and she then spoke with Mr. Zedlitz. (DSMF ¶ 17, PSMF ¶ 17). Mr. Zedlitz asked Ms. Randall about Mr. McNally's conduct and told her that the matter would be investigated. (DSMF ¶ 17). Several other female employees had also complained about Mr. McNally's conduct. (DSMF ¶ 17, PSMF ¶ 17). Upon learning this information, Mr. Zedlitz immediately "put [Mr. McNally] out of the building that night" and placed him on administrative leave pending an investigation. (DSMF ¶ 18). Richard Finkenberg, the MDO of Tour 3, was assigned to investigate. (DSMF ¶ 18). Mr. McNally never returned to work at the Hampden facility. (DSMF ¶ 18).

#### B. Transfer to Greenbush Post Office: January 2000—September 25, 2000

Ms. Randall "had some concerns about being in the plant during the investigation" of Mr. McNally, and therefore Mr. Zedlitz told her he would assist in getting her transferred to an associate office while the investigation was ongoing. (DSMF ¶ 20). Steve Pelletier, the customer service operations manager in charge of the associate

---

5. Ms Randall qualified her admission of this statement. (PSMF ¶ 11). Although she testified to this language at her deposition, she later recalled he actually said, "fuck like dogs," a linguistic difference without meaningful distinction.

offices, assigned Ms. Randall to be an officer in charge ("OIC") at the post office in Greenbush, thirty miles from the Hampden facility. (DSMF ¶ 21). Ms. Randall worked at the Greenbush Post Office from February 14, 2000 to September 25, 2000; she worked from 7:00 a.m. to 5:00 p.m. and sorted the mail, waited on customers, performed accounting, and ordered stamps. (DSMF ¶ 22). According to Ms. Randall, when she was transferred, Mr. Zedlitz said she "wouldn't have to come back to Hampden ever again." (DSMF ¶ 23). Ms. Randall "felt" she would be staying in Greenbush. (DSMF ¶ 23).

### 1. Mike Dyer Searches for Negative Information

While at Greenbush, Deborah Noonan, a Hampden mail handler, called Ms. Randall and told her that supervisor Mike Dyer, who was Mr. McNally's union representative, was soliciting statements against Ms. Randall. (DSMF ¶ 24). Mr. Dyer, who was responsible for defending Mr. McNally, had asked employees whether they had witnessed improper conduct by Mr. McNally or whether they heard Ms. Randall use profane language or tell dirty jokes. (DSMF ¶ 25). Mr. Dyer did not discover any negative information about Ms. Randall. (DSMF ¶ 25).

Ms. Randall called Mr. Zedlitz and informed him of Mr. Dyer's actions, and Mr. Zedlitz said he would investigate and take care of it. (DSMF ¶ 24). Mr. Finkenberg advised Mr. Dyer that he should receive authority to be released from his postal service assignment before conducting the investigation during work hours. (DSMF ¶ 25). He also told Mr. Dyer that because there had been no disciplinary charges initiated against Mr. McNally at that point, he was "putting the cart before the horse." (DSMF ¶ 26). Ms Randall understood that Mr. Dyer received a two-week suspension for his conduct, was investigated, and returned to the facility.[6] (DSMF ¶ 27). Ultimately, Mr. Dyer considered Mr. McNally's demotion was deserved because he had been untruthful. (DSMF ¶ 25 n.16).

### 2. Ken Carr Visits Greenbush

Ken Carr, a clerk at the Hamden facility and friend of both Ms. Randall and Mr. McNally, came to the Greenbush Post Office while Ms. Randall was working, accused her of complaining about Mr. McNally, called her a "bitch," kicked the counter, and said that she "better take it back or he and other people were going to get back at [her] and write statements." (DSMF ¶ 28). Ms. Randall was "pretty scared" and told Mr. Carr to stop or she was going to call the Sheriff's Department. (DSMF ¶ 28). Mr. Carr calmed down, and Ms. Randall told him what Mr. McNally was doing was wrong. (DSMF ¶ 28). After Mr. Carr left, Ms. Randall called Mr.

---

**6.** Ms. Randall admitted the Postal Service's Statement that she "understood that Dyer received a two week suspension for this conduct." (DSMF ¶ 27). The Postal Service also made a qualified admission to Ms. Randall's assertion that she understood Mr. Dyer had been suspended for two weeks. (PSMF ¶ 46). In its qualified admission, the Postal Service referred to its Statements ¶¶ 24 and 27 and to specific portions of the deposition transcript of Louis Zedlitz. In that deposition, Mr. Zedlitz contradicts Ms. Randall. He testified Mr. Dyer had been put on administrative leave "pending an investigation" with pay for "three or four days." (Zedlitz Dep. at 40:19–25; 42:10–12). Mr. Zedlitz testified the reason Mr. Dyer had been put on administrative leave was the Postal Service thought he may have been creating a hostile work environment, but upon investigation, it found "nothing to substantiate those claims." (Zedlitz at 41:1–6). Despite this testimony, the Postal Service later failed to deny Ms. Randall's Statement that when she returned from Greenbush, Mr. Dyer said: "thanks for the two week vacation." (PSMF ¶ 58).

Zedlitz and told him what happened. (DSMF ¶ 29). Ms. Randall understood Mr. Zedlitz talked to Mr. Carr and he "ended up quitting because of the whole thing." (DSMF ¶ 29).

### C. Transfer Back to Hampden: September 2000—February 2001

#### 1. September 21, 2000: Mr. McNally Leaves

In late September or early October 2000, Ms. Randall learned she was going to be transferred back to the Hampden facility. (DSMF ¶ 30). By this time, the McNally investigation had concluded. (DSMF ¶ 30). Mr. McNally was notified on August 15, 2000 he was to be removed from any supervisory role and downgraded to a craft position as a PTF because he made inappropriate comments. (DSMF ¶ 19). Mr. McNally challenged the personnel action, and to resolve his challenge, on September 21, 2000, Mr. Zedlitz assigned Mr. McNally for 180 days as an OIC at a small post office in Sorrento, Maine where he would not supervise any employees. (DSMF ¶ 19). Mr. McNally was downgraded to the PTF position on March 28, 2001. (DSMF ¶ 19).

#### 2. October 2000: Ms. Randall Returns [7]

In October 2000, Ms. Randall returned to the Hampden facility and worked as a flat sorter on Tour 3. (DSMF ¶ 32). Mr. Finkenberg was the MDO of Tour 3, and Michael Dyer was her direct supervisor.[8] (DSMF ¶ 32, PSMF ¶ 32). Ken Farris and Paul Hendrickson were Ms. Randall's relief supervisors. (DSMF ¶ 32). Upon learning of Ms. Randall's return, Mr. Finkenberg talked to the supervisors and the union officials and made it clear not to retaliate against Ms. Randall or give her a "hard time." (DSMF ¶ 33, PSMF ¶ 33). On Tour 3, Ms. Randall worked with different employees than she had worked with on Tour 2 in 1999, but with some of the same employees when she was a transitional or casual employee. (DSMF ¶ 33).

#### 3. October 2000—February 2001: The Harassment Starts Again

In December 2000 or January 2001, some of Ms. Randall's male co-workers tackled her and pushed her into a snow bank. (PSMF ¶ 56). They bragged to people in the break room that "they had just cooled [her] ass off." (PSMF ¶ 56). These male workers also made obscene and lewd sexual comments to her. (PSMF ¶¶ 55, 56) [9]

7. The Postal Service contends any events after October 2000 are irrelevant to its Motion for Summary Judgment, because it is seeking judgment only on events that pre-date October 2000. Obviously, however, the post-October 2000 events are essential to assessing the continuing violation issue.

8. The Postal Service states that Mr. Fernald, not Mr. Dyer, was Ms. Randall's primary supervisor and Mr. Dyer was one of three relief supervisors on tour 3 and occasionally supervised Ms. Randall. (DSMF ¶ 32).

9. Ms. Randall states they made comments such as "suck my cock," "Linda has a hot ass," "blow me bitch," and "blow a tailpipe." (PSMF ¶ 55). She states she was asked what

size "tits" she had, her bra was snapped, her use of the telephone was interfered with, she was called bitch, and her belongings were stolen. (PSMF ¶ 56). Ms. Randall's Statements of Material Fact do not clarify who engaged in this activity; the Postal Service denied these Statements of Material Fact.

As phrased, it is questionable whether the Statements meet Rule 56(e)'s requirement that they be based on "facts as would be admissible in evidence." Fed.R.Civ.P. 56(e); *see also Nieves–Luciano v. Hernandez Torres*, 397 F.3d 1, 2 (1st Cir.2005); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir.2001). There is no indication in the Statements themselves who engaged in this harassment. Her Statement ¶ 56 cites her deposition,

Ms. Randall testified the following incidents of harassment occurred upon her return to the Hampden facility:

(1) James Mercure, a union steward, told Ms. Randall: "I own you. I will make you pay. You are going to do what I want you to do. I can make your life miserable" and "you better not say anything. I will slap you" (PSMF ¶ 61);

(2) Within her first week back, Dan Sickler told her: "I can tell you to blow me and get away with it" and "Nobody is going to do anything." (PSMF ¶ 62). He would kick Ms. Randall "whenever he got the opportunity" and told her, he was "going to get [her] ass kicked real good that day" (PSMF ¶ 63);

(3) Mr. Mercure and Mr. Sickler told her they would say anything they wanted to her and that she was not going to report them as she did Mr. McNally (PSMF ¶ 64); and,

(4) Joel Greenleaf told Ms. Randall she ought to give Mr. Sickler "a blow job" and they "ought to have a threesome" and asked her the size of her bra. (PSMF ¶ 65).

According to Ms. Randall, she complained to Mr. Zedlitz, the plant manager, approximately one week after her return to the Hampden facility, and he told her to "deal with it." (PSMF ¶¶ 66, 67). Ms. Randall testified she met with Mr. Finkenberg and told him what was going on and he transferred her from the flat sorter to priority and express mail, which is across the building from the flat sorter. (PSMF ¶¶ 68–69). Despite being transferred to priority and express mail, Ms. Randall testified Mr. Dyer would frequently make her return to the flat sorter. (PSMF ¶ 71).

### 4. February 26, 2001: Ms. Randall Quits

Ms. Randall stopped working on February 26, 2001, alleging the sexual harassment caused her to be physically ill. (DSMF ¶ 35, PSMF ¶ 78). Ms. Randall testified that, on her last day of work, Mr. Finkenberg told her the situation was not going to get any better and told her she should quit; he said, "[w]hy don't you make this your last day and I'll take you out and get you drunk." (PSMF ¶ 75). According to Ms. Randall, Mr. Finkenberg called her a "pain in the ass." (PSMF ¶ 76).

### D. Administrative Complaints

On July 19, 2001, Ms. Randall filed an EEOC Complaint of Discrimination. (DSMF ¶ 36). In September 2001, the Postal Service dismissed Ms. Randall's pre-October 2000 claims because she failed to exhaust administrative remedies as to those claims and failed to establish a continuing violation. (DSMF ¶ 36, Ex. A at 2–4). Specifically, the Postal Service found Ms. Randall reported her sexual harassment claim to management in February 2000 through her Union, and therefore, she "had reasonable suspicion of discrimination when [she] made [her] union aware of the alleged sexual conduct," but did not seek EEOC counseling until January 23, 2001. (DSMF ¶ 36, Ex. A at 2). The Postal Service also determined Ms. Randall had constructive knowledge of the Postal Service's anti-sexual harassment policies. (DSMF ¶ 36, Decl. of Robert Hylen at Ex. A at 3).

### E. Procedural Posture

On June 2, 2003, Ms. Randall received a Notice of Final Decision, affirming the dis-

---

which identifies the men who pushed her in the snow bank as James and Dan, referring to James Mercure and Dan Sickler. (Pl.'s Dep.

at 119–20). But, there is no indication who made these obscene and degrading statements.

missal of her pre-October 2000 claims and finding she failed to prove discrimination on her post-October 2000 claims. (Compl. ¶ 6 at Ex. A (Docket # 1)). Ms. Randall filed this Complaint on August 15, 2003.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law," *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000), and for an issue to be "genuine," the evidence relevant to the issue, viewed in the light most favorable to the non-moving party, must be "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side," *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

The trial court is obligated to view the entire record in the light most hospitable to the nonmovant and indulge "all reasonable inferences in that party's favor." *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir.1997); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). This Court has stated, however, that in discrimination actions, "[c]aution is appropriate when considering summary judgment for an employer." *Bilodeau v. Mega Indus.*, 50 F.Supp.2d 27, 46 (D.Me.1999).

## III. DISCUSSION

### A. Hostile Work Environment

■ Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).[10] "[T]he very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.". *Harris v. Forklift Sys.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Courts have long recognized that sexual harassment is "a form of gender discrimination prohibited by Title VII." *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001) (citations omitted). Title VII sexual harassment law has evolved considerably from its early focus on quid pro quo sexual harassment, where an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the subordinate's employment. *See Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 897 (1st Cir.1988) (collecting cases). Title VII also allows a plaintiff to prove unlawful discrimination by showing that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (citations omitted). Further, Title VII protection is

**10.** Ms. Randall also invokes 42 U.S.C. § 1981a, which provides rights of recovery for violation of 42 U.S.C. § 2000e–16. Section 2000e–16 prohibits discrimination on the basis of sex in federal government employment, including specifically the United States Postal Service. 42 U.S.C. § 2000e–16(a).

not limited to "economic" or "tangible" discrimination. *Id.*

■ To succeed on a hostile work environment sexual harassment claim a plaintiff must establish: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and, (6) that some basis for employer liability has been established. *O'Rourke,* 235 F.3d at 728 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)); *see also Rivera v. Puerto Rico Aqueduct & Sewers Auth.,* 331 F.3d 183, 189 (1st Cir.2003).

## B. Timeliness and Exhaustion of Administrative Remedies

■ The Postal Service contends any claims based on conduct occurring before October 2000 must be dismissed because Ms. Randall did not timely raise and exhaust them in administrative proceedings. A federal employee alleging Title VII employment discrimination must exhaust administrative remedies before bringing a court action. *Jensen v. Frank,* 912 F.2d 517, 520 (1st Cir.1990). To exhaust her administrative remedies, a plaintiff must contact an EEOC counselor within forty-five days of the allegedly discriminatory incident.[11] 29 C.F.R. § 1614.105(a)(1); *see also Velazquez–Rivera v. Danzig,* 234 F.3d 790, 794 (1st Cir.2000)(administrative remedies had not been exhausted since there had been no contact with an EEOC counselor within 45 days); *Roman–Martinez v. Runyon,* 100 F.3d 213, 216–18 (1st Cir.1996)(holding that a federal employee's failure to contact an EEOC counselor within the limitations period causes him to lose his right to pursue a later de novo action in court). Failure to do so bars a plaintiff from bringing a court action based on that incident. *Jensen,* 912 F.2d at 520.

Ms. Randall first contacted the EEOC counselor on January 23, 2001, making the cut-off date December 8, 2000. However, for purposes of its motion, the Postal Service has conceded that, because the EEOC investigation extended to October 2000, when Ms. Randall returned to Hampden, "the statutory time period for the plaintiff's claims begins in late October 2000." (Def.'s Mot. for Partial Summ. J. and Incorporated Mem. of Law at 12 n.3 (Docket # 19)).

## C. Discrete Acts Prior to October 2000

■ To the extent Ms. Randall's Complaint concerns "discrete"[12] acts of alleged discrimination occurring before the cut-off date, they cannot be converted into a single unlawful practice for purposes of time-

---

11. If the issue is not resolved by informal counseling, the employee may, within fifteen days thereafter, file a formal administrative complaint. 29 C.F.R. § 1614.106(a), (b). An employee who timely files a formal administrative complaint may file a civil action in district court within 90 days of receipt of notice of the final administrative decision or after 180 days if there has been no administrative decision. 42 U.S.C. § 2000e–16(c).

12. To illustrate the meaning of the term "discrete discriminatory act," the Supreme Court identified the following examples: "termination, failure to promote, denial of transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

ly filing, and thus are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061.[13] Thus, the Postal Service's Motion for Partial Summary Judgment on Ms. Randall's claims for discrete acts of alleged discrimination prior to October 2000 not part of a continuing violation must be granted, since those discrete events are time-barred under *Morgan*.

### D. Discrete Acts and Hostile Work Environment Claims After October 2000

In its Motion for Partial Summary Judgment, the Postal Service has not raised any legal issues about Ms. Randall's post-October 2000 claims, whether discrete acts or hostile work environment, leading to her resignation on February 26, 2001.

### E. *National Railroad Passenger Corp. v. Morgan:* "Continuing Violation" Theory

The Postal Service's Motion for Partial Summary Judgment focuses on whether Ms. Randall can recover for pre-October 2000 claims. Citing *Morgan*, Ms. Randall claims she can recover under the theory that the post-October 2000 actions were a "continuing violation" of the pre-October 2000 incidents.

### 1. Continuing Violation Theory: General Principles

■ *Morgan* mandates a different exhaustion inquiry for Title VII claims involving a hostile work environment. Because "a hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful em-

ployment practice'," such a claim will not be time-barred merely because a portion of the individual acts that comprise the hostile work environment took place outside the forty-five day statutory filing period. *Id.* at 117, 122 S.Ct. 2061 (citation omitted). Under this theory, Ms. Randall claims she can reach back, even to Mr. Defillipo's 1996 indecent exposure and to all Mr. McNally's pre-October 2000 conduct, and impose liability on the Postal Service.

■ By its nature, a hostile work environment "often means that there are a series of events which mount over time to create such a poisonous atmosphere as to violate the law." *O'Rourke*, 235 F.3d at 727. Hostile environment claims are different from discrete acts; their very nature involves repeated conduct. *Morgan*, 536 U.S. at 115, 122 S.Ct. 2061. "The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence." *Id.* (citations omitted). The "unlawful employment practice" therefore cannot be said to occur on a particular day. *Id.* "It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *Id.* Such claims are based on the cumulative effect of individual acts." *Id.*

■ In the leading Supreme Court cases, the evidence of harassment covered a period of years. *Faragher*, 524 U.S. at 782, 118 S.Ct. 2275 (five-year period); *Harris*, 510 U.S. at 19, 114 S.Ct. 367 (two and a half years); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 59–60, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (four

---

**13.** *Morgan* addresses the 180–300 day filing rule for non-federal employees. However, courts have treated the forty-five day requirement for federal employees in much the same way. *See Jensen v. Henderson*, 315 F.3d 854, 859 (8th Cir.2002); *McFarland v. Henderson*, 307 F.3d 402, 408 (6th Cir.2002).

years). Accordingly, there is "a natural affinity between the hostile work environment theory and the continuing violation doctrine." *O'Rourke*, 235 F.3d at 727. "Thus, a court should not hastily dismiss on timeliness grounds a harassment claim where a continuing violation is alleged." *Id.* Nevertheless, the two theories are not the same; "not every hostile work environment claim presents a plausible continuing violation." *Id.* The First Circuit declined "to adopt a per se rule that a properly alleged hostile work environment claim also constitutes a continuing violation." *Id.* at 727–28 (quoting *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995)).

▆▆▆▆ Provided an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability. *Morgan*, 536 U.S. at 117, 122 S.Ct. 2061. "A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120, 122 S.Ct. 2061. Therefore, courts must look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[14] *Harris*, 510 U.S. at 23, 114 S.Ct. 367. In this regard, the alleged acts of physical and verbal abuse "cannot be considered unless [Plaintiff] can point to an act that is part of the same hostile work environment and that falls within the limitations period." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 725 (7th Cir.2004). "Unless there are no material facts in dispute permitting resolution as a matter of law as to whether a continuing violation occurred, it is a jury issue." *O'Rourke*, 235 F.3d at 727.

### 2. The "Intervening Action" Limitation

▆▆▆▆ The Postal Service does not take issue with this well developed body of law. It relies, instead, on a limitation to the continuing violation theory: if such acts are no longer part of the same hostile work environment claim because of "certain intervening action by the employer," the causal link may be broken. *Morgan*, 536 U.S. at 118, 122 S.Ct. 2061; *see also Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258–59 (11th Cir.2003)(intervening action by the employer renders the co-worker's

14. The following scenarios illustrate this point:

(1) Acts on days 1–400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1–100 and on day 401, but there are no acts between days 101–400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim. On the other hand, if an act on day 401 had no relation to the acts between days 1–100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.
*Morgan*, 536 U.S. at 118, 122 S.Ct. 2061.

conduct no longer part of the plaintiff's hostile work environment claim); *Costanzo v. United States Postal Serv.,* No. 00 Civ. 5044(NRB), 2003 WL 1701998, at *11 (S.D.N.Y. Mar.31, 2003)(whatever abuse the plaintiff received from December 1997 through March 1998, her working circumstances clearly changed after her transfer to a new team with a new direct supervisor in March 1998); *Fairley v. Potter,* No. C–01–1363 VRW, 2003 WL 403361 (N.D.Cal. Feb.13, 2003)(the employer's adequate handling and investigation of the plaintiff's complaint constituted an intervening action). *Morgan* assists in the analysis by pointing to at least three significant factors: 1) whether the within and without statute of limitations harassment involve "the same type of employment actions"; 2) whether they occurred "relatively frequently"; and, 3) whether they were "perpetrated by the same managers." *Morgan,* 536 U.S. at 120, 122 S.Ct. 2061 (citation omitted). These questions are directed to whether the course of action is "part of the same actionable hostile environment claim." *Morgan,* 536 U.S. at 121, 122 S.Ct. 2061.

There is little decisional authority specifically on the degree of "intervening action by the employer" sufficient to break causation. In *Watson,* the Eleventh Circuit concluded that an employee's harassing actions could not be considered to determine the employer's liability, when, upon notice, the employer took effective action and that employee's harassment ceased. *Watson,* 324 F.3d at 1258–59. In *Costanzo,* a case involving the Postal Service, the plaintiff claimed a long term hostile work environment. The district court noted the employee had been transferred to a "new team with a new direct supervisor." *Costanzo,* 2003 WL 1701998, at *11. The court concluded under *Morgan* the pre-transfer acts of alleged harassment were "no longer part of the same hostile envi-

ronment claim" and the employee could not recover for them. *Id.* In *Fairley,* also a Postal Service case, the district court concluded that because the Postal Service launched a prompt investigation, immediately separated the two employees directly involved, warned the harassers, and ordered them to stay away from the victims, the Postal Service could not "as a matter of law" be liable. *Fairley,* 2003 WL 403361 at *8–9. In *Foley v. Proctor & Gamble Distrib. Co.,* No. Civ. A. 01–11314–RWZ, 2003 WL 21696544 (D.Mass. July 21, 2003), the employer took "prompt, effective remedial action" and "decisively changed plaintiff's work environment" by transferring his supervisor across the country. *Foley,* 2003 WL 21696544, at *2. Judge Zobel concluded the employer was not liable for plaintiff's sexual harassment hostile environment claims. *Id.*

### 3. Point and Counterpoint

To support her continuing violation claim, Ms. Randall argues the harassment she "was subjected to upon her transfer back to the Hampden facility in October 2000 was related to the harassment by Brad McNally from 1996 or 1997 until January 2000." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Sum. J. at 14 (Docket # 22)). Ms. Randall avers: "The co-workers who harassed [her] upon her return to Hampden specifically mentioned Mr. McNally during that harassment, ... and it can be inferred their harassment was, at least in part, to retaliate against Ms. Randall for reporting the harassment by Mr. McNally." (*Id.* at 15).

The Postal Service responds Ms. Randall cannot recover for her pre-October 2000 claims on the basis of continuing violations because: (1) the two periods are separated by Ms. Randall's transfer to another facility in Greenbush; (2) the two periods involved different tours with dif-

ferent co-workers and substantially different supervisors; (3) the Postal Service's actions to suspend and discipline Mr. McNally were intervening actions; and, (4) Mr. McNally never returned to the Hampden facility. (Def.'s Mot. for Partial Sum. J. and Incorporated Mem. of Law at 14–15). Ms. Randall counters that the harassment continued while she was working at Greenbush and that her transfer back to Hampden where she worked under the supervision of Mr. Dyer, who had defended Mr. McNally and had been suspended for improperly soliciting statements against Ms. Randall, made the harassment more likely to occur. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 15).

### 4. Evidence of a Continuing Violation and an Intervening Action

#### a. Brad McNally

Prior to October 2000, three individuals harassed Ms. Randall: 1) Mr. McNally; 2) Mr. Dyer; and, 3) Mr. Carr.[15] The record contains abundant evidence of Mr. McNally's inappropriate and offensive conduct, beginning in 1996 and continuing to January 2000, when Ms. Randall was transferred. Mr. McNally's conduct was precisely the type of boorish inexcusable sexual harassment Title VII was intended to address. However, when Ms. Randall complained, the Postal Service took prompt, effective remedial action. It investigated Mr. McNally, separated Ms. Randall from him, demoted him, transferred him far away from Hampden, and returned her to work under different supervisors, a different shift, and a different crew. After October 2000, there is no evidence Mr. McNally ever directly persisted in harassing Ms. Randall.

#### b. Mike Dyer

Ms. Randall's pre-October 2000 complaint against Mr. Dyer was that he was engaging in a campaign to secure negative information about her while she was in Greenbush. Upon her complaint, the Postal Service promptly investigated and disciplined Mr. Dyer and he apparently ceased his investigation.[16]

#### c. Ken Carr

While she was in Greenbush, Mr. Carr visited her, expressed his outrage at her complaints against Mr. McNally and frightened Ms. Randall. Again, upon her complaint, the Postal Service investigated and Mr. Carr "ended up quitting over the whole thing." The record does not reveal when Mr. Carr quit, but there is no indication he was still employed when she returned in October 2000.

---

15. There is also evidence that, in 1996, another co-worker, Mr. Defillipo, exposed himself to Ms. Randall.

16. In response to the Postal Service's Statement of Material Fact ¶ 26, Ms. Randall denied Mr. Dyer actually ceased his investigation, asserting the record citation did not support the statement. She points out Mr. Finkenberg only testified he "believed" Mr. Dyer ceased his investigation. Once again, Ms. Randall's objection is hyper-technical. The Postal Service cited a portion of Mr. Finkenberg's deposition. (Finkenberg Dep. at 19:12–13). Just prior to the cited question and answer, Mr. Finkenberg testified he had called Mr. Dyer into his office when he heard of the Dyer investigation and told him "to cease and desist and if he was to continue, [he] would take disciplinary action against him." (*Id.* at 19: 9–11). He was then asked if he ceased and he replied: "I believe he did." (*Id.* at 19:12–13). This Court infers from the fact that Mr. Finkenberg was Mr. Dyer's supervisor, that he had warned him to "cease and desist," and that he believed he had ceased, that Mr. Dyer had in fact ceased his investigation. Ms. Randall presented no evidence that Mr. Dyer did not do what Mr. Finkenberg believed he had done.

### 5. Pre–October 2000 Claims: Conclusion

In this Court's view, the Postal Service's responses to Ms. Randall's pre-October 2000 complaints against Messrs. McNally, Dyer and Carr were precisely the types of actions *Morgan* contemplated when it referred to "intervening action by the employer." Mr. McNally was transferred, Mr. Dyer was disciplined, and Mr. Carr quit. During this period, Ms. Randall was physically separated from all three of them and when she returned, she was placed on a different crew.

#### a. Mr. McNally and Mr. Carr

 Neither Mr. McNally nor Mr. Carr is alleged to have harassed her after October 2000. The actions of Mr. McNally and of Mr. Carr cannot form the basis for the imposition of liability against the Postal Service because they are out of time, the Postal Service took intervening action, and the causal link for a continuing violation is not present.

#### b. Mr. Dyer

This leaves Mr. Dyer. Ms. Randall claims that Mr. Dyer's actions in investigating her constituted gender-based harassment. The evidence reveals that as union representative, he undertook an investigation of Ms. Randall's sexual harassment charges against Mr. McNally and while doing so, asked if she had encouraged Mr. McNally's conduct. There is no evidence that Mr. Dyer conducted this part of the investigation due to sex-based animus or to harass Ms. Randall. Ms. Randall assumes Mr. Dyer investigated her conduct only to develop negative infor-

mation about her and as a corollary to Mr. McNally's harassment; however, the evidence is that Mr. Dyer investigated Ms. Randall to place in context Mr. McNally's actions in order to assess the potency of the evidence against him.[17] There is no evidence that Mr. Dyer attempted to influence the employees' responses, that he denigrated Ms. Randall during the investigation, or that he was improperly motivated. His investigation revealed no negative information concerning Ms. Randall and he later concluded Mr. McNally's demotion was deserved. The Postal Service's administrative leave appears to have been based first on Ms. Randall's charge that he was harassing her by seeking out negative information, a charge it concluded was not substantiated; and, second, on his use of work hours to conduct the investigation. Based on the record before it, this Court cannot find Mr. Dyer's pre–2000 investigation of Ms. Randall's charges is probative evidence of a continuing violation of sexual harassment.

 Further, to find a continuing violation, *Morgan* requires the pre— and post-statute events be "part of the same actionable hostile environment claim." *Morgan*, 536 U.S. at 121, 122 S.Ct. 2061. Here, Ms. Randall's post-October 2000 allegations against Mr. Dyer were that: 1) he told her "thanks for the two week vacation"; 2) he told her he had statements from his investigation and asked her if she wanted to see them to see what people really thought about her; 3) he gave her an official warning regarding attendance one day after her union representative had cleared up her attendance issue and while doing so, he tried to make her sign a disciplinary statement without permitting

---

17. Ms. Randall admitted the Postal Service's Statement of Material Fact ¶ 25, footnote 16, which states: "Dyer considered McNally innocent until proven guilty and that a portion of McNally's defense might be to discredit plaintiff's complaints about him. Ultimately, Dyer considered that McNally's demotion was deserved because he had been untruthful." (Citations omitted).

her to have a union representative present; and, 4) he frequently assigned her back to the flat sorter position.[18] (PSMF ¶¶ 58, 59, 71).

In this Court's view, these allegations, even when viewed in a light most favorable to Ms. Randall, are insufficient to establish a continuing violation. Although the allegations against Mr. Dyer involved the same manager, the pre— and post-limitations period incidents do not involve "the same type of employment actions" and there is no evidence they occurred with relative frequency. *Morgan,* 536 U.S. at 120, 122 S.Ct. 2061. Even if Mr. Dyer's pre-limitation actions are considered in the context of his and other Postal employees' post-limitation actions, the evidence, again even when viewed in a light most favorable to Ms. Randall, simply does not sustain a conclusion that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" for purposes of a continuing violation claim. *Id.* at 116, 122 S.Ct. 2061 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367).

### 6. Nexus: Pre— and Post–October 2000 Harassment and Intervening Action

The actions of the three pre-October 2000 employees having been severed under *Morgan* by the intervening action of the Postal Service, this leaves only the allegation that the post-October 2000 harassment was connected with the pre-October 2000 harassment by virtue of the offending employees invoking Mr. McNally's name. Ms. Randall is able under *Morgan* to seek to introduce prior acts as background evidence to support her timely claim. *Id.* at 113, 122 S.Ct. 2061. However, she is not under *Morgan* able to fix liability on the Postal Service for actions that took place prior to October 2000.[19]

### IV. CONCLUSION

This Court GRANTS the Postal Service's Motion for Partial Summary Judgment. The Plaintiff cannot recover against the Postal Service for pre-October 2000 events, either as discrete events or as evidence of a continuing violation. However, the Plaintiff is not barred from seeking to introduce evidence of pre-October 2000 events as background for her post-October 2000 Title VII claims.

SO ORDERED.

---

**18.** In its response, the Postal Service failed to respond to Ms. Randall's Statement of Material Fact ¶ 58 in which Ms. Randall stated that Mr. Dyer thanked her for the two week vacation. This portion of the Statement is deemed admitted. D. Me. Loc. R. 56(e). The Postal Service has either denied or qualified the remaining three statements; this Court assumes their truth for purposes of the pending motion.

**19.** The Postal Service also raised in its motion the question of whether it could be held liable for the pre-October 2000 actions of its co-employees and supervisors under the *Faragh-er/Ellerth* defense. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *White v. New Hampshire Dep't of Corr.,* 221 F.3d 254, 261 (1st Cir.2000). Because this Court determines the pre-October 2000 claims are time-barred and may be used only as background for the post-October 2000 claims, it is unnecessary to reach the question whether, if not time-barred, the pre-October 2000 claims would be otherwise subject to summary judgment.