2020 IL App (1st) 191855-U

SECOND DIVISION
May 12, 2020

No. 1-19-1855

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| TRACEY J. ELLIS, | ) | Petition for Direct Administrative |
| | ) | Review of a Decision of the Illinois |
| Petitioner-Appellant, | ) | Human Rights Commission. |
| | ) | |
| v. | ) | |
| | ) | No. 2018 CF 1034 |
| ILLINOIS HUMAN RIGHTS COMMISSION, | ) | |
| ILLINOIS DEPARTMENT OF HUMAN | ) | |
| RIGHTS, and LAWRENCE MERCHANDISING, | ) | |
| LLC, d/b/a LAWRENCE MERCHANDISING | ) | |
| SERVICES, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

*HELD*: The Illinois Human Rights Commission did not abuse its discretion by sustaining the dismissal of petitioner's charge of unlawful employment discrimination for lack of substantial evidence.

¶ 1    Petitioner-appellant Tracey J. Ellis (petitioner) appeals *pro se* from a final order entered by respondent-appellee the Illinois Human Rights Commission (Commission) sustaining respondent-appellee the Illinois Department of Human Rights' (Department) dismissal of her charge of unlawful employment discrimination against respondent-appellee Lawrence Merchandising, LLC, d/b/a Lawrence Merchandising Services (LMS). Petitioner alleged that LMS unlawfully discharged her from its employ based on her race in violation of section 5-102(A) of the Illinois Human Rights Act (Act) (775 ILCS 5/5-102(A) (West 2016)). The Department dismissed her charge for lack of substantial evidence. Petitioner sought review from the Commission, which sustained the Department's decision. She now appeals, contending that the Commission abused its discretion in sustaining the dismissal of her cause. She asks that we reverse the order entered by the Commission and that we "award [her] a settlement based on lost wages, benefits, emotional distress, plus reimbursement of filing fee, and photocopying expenses," for a total of "at least $30,000." For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3    LMS is a visual merchandising company that provides services to retail stores, including setting up visual displays, completing inventory, stickering products and placing inventory on shelves. In May 2017, LMS hired petitioner as a part-time service representative. Her immediate LMS supervisory was Field Service Coordinator Jordan Imdieke (non-black), and his supervisor was Field Service Coordinator Supervisor Michelle Borowske (non-black).

¶ 4    In February 2019, petitioner filed an employment discrimination charge with the Department alleging that LMS unlawfully discharged her because of her race, which she described as "black." In her petition, she averred that she was hired by LMS on a part-time

2

basis in early May 2017. In September 2017, she was assigned to complete her duties for LMS at Target retail stores. Petitioner claimed that between this time, her work performance was "excellent," she received "positive performance reviews," and "had no complaints about her performance." Petitioner stated that once she started working for LMS at Target stores, however, incidents not of her own making began to happen. For example, she first recounted that she was "interrupted by a non-black Target employee/security guard for no reason" with respect to failing to notify a team leader on duty about her work. She stated that later, "she was hassled by Target's Security Guard and another Target employee" because she was not wearing a required Target Guest Pass, but that this "was not her fault." She then claimed that on November 28, 2017, while working at a Target store in Evanston, she tried to find the required Target Guest Pass but did not, and when she approached a Target manager, the manager became upset and petitioner continued working without the pass. She averred that she was then confronted by a Target security officer, who accompanied her to get a pass; after she got the pass and went to work in a stockroom, the security guard approached her again, this time about being in that location. Petitioner stated she continued her work, finished her assignment and then left the store. She recounted that later in the day, she received a call from Imdieke, who told her he had received a call from the Target's store manager stating petitioner had not been wearing the required pass and that Target no longer wanted her to work at that location. She then received an email from Imdieke terminating her employment with LMS. In her filing, petitioner claimed LMS denied her equal employment and insisted that, while she had no knowledge if other employees were discharged, she believed she was the only black employee treated this way and that LMS treated similarly situated non-black employees more favorably under similar circumstances.

3

¶ 5        Based on her petition, the Department conducted an investigation, interviewed Imdieke, Borowske and LMS' Human Resources Director Sue Schmidt (non-black), and obtained the following evidence from LMS. Schmidt stated that LMS hired petitioner as a part-time service representative. Schmidt verified that, the next day, LMS issued to petitioner its Representative Employee Manual, which included information regarding not only her particular job description and responsibilities, but also LMS' general employment policies, including its Equal Employment Opportunities, Professionalism, Progressive Discipline, Badge and Lanyard requirements, and Store Security mandates. Schmidt affirmed that petitioner electronically signed a receipt for the manual upon its issuance to her, acknowledging that she received it. There was no indication in the Department's findings that Schmidt ever dealt with petitioner in person or knew of her race.

¶ 6        Likewise, Imdieke, petitioner's immediate LMS supervisor, stated that he communicated with petitioner via telephone and email and had never met her in person. Contrary to petitioner's claims that she had consistently received positive performance reviews and no complaints about her work until September, Imdieke noted that her "performance issues began just a few months after she was hired," noting she did not take criticism well and had received employment counseling. He then described several incidents with respect to her assignments at Target stores. On September 8, 2017, he was contacted by a Target store manager asking him to remind petitioner that she was required to wear a visitor's sticker when working in the store's backroom; Imdieke informed petitioner of this and gave her a warning for failing to follow client store security policy, to which petitioner responded with a series of emails identifying excuses for her violation. On November 21, 2017, Imdieke again had to issue petitioner a warning, this time for failing to take clear photographs of her

completed services for LMS at Target, as petitioner had taken and submitted photos of incorrect products and others' work instead of products and work for which she was responsible. In response, petitioner sent Imdieke several emails with excuses and argumentative explanations, whereupon he replied that these needed to stop.

¶ 7   Imdieke further described the final incident that resulted in petitioner's termination. On November 28, 2017, while petitioner was working for LMS at the Target store in Evanston, the store manager contacted him to report that petitioner was wandering around the stockroom without either the required LMS badge or the Target visitor sticker. When the manager approached her and asked if she could help her, petitioner told her she had already spoken to whom she needed. When the manager informed petitioner that she (the manager) was that person, an argument ensued; eventually, the manager left petitioner to complete her services. Following this incident, the manager contacted Imdieke again the same day, reporting that this was not the first time petitioner failed to wear the Target visitor sticker; she told Imdieke that while she was upset with petitioner's "insubordinate and argumentative behavior," she was willing to let her finish her services if she could commit to following store policy and respecting staff. The manager also asked Imdieke to refrain from addressing any issues with petitioner until petitioner left the store for the day for fear that petitioner would lash out at Target employees. However, about an hour later, the store manager contacted Imdieke a third time, this time to report that she had asked petitioner to leave the store without finishing her services. The store manager explained to Imdieke that petitioner continued to wander around the stockroom without the required visitor badge, even after she was asked not to. When a Target employee told petitioner she could not enter the locked stockroom cage without an ID, petitioner called the employee a "hillbilly" and started

banging on and slamming the cage. The manager asked petitioner to leave and banned her from returning to that Target store. Upon this last report, Imdieke contacted his superior, Borowske, and reported the incidents of petitioner's "insubordinate, argumentative, and threatening behavior;" Borowske advised that this was grounds for termination. Imdieke contacted petitioner and gave her the opportunity to explain, whereupon petitioner "became defensive and claimed that the Target employees were liars." When Imdieke told petitioner her employment was being terminated, she responded by stating she would be filing a lawsuit against LMS for racism. Imdieke then asked petitioner why she felt he was being racist, and petitioner replied, " 'I know what you look like, and I can tell from your voice that you're an ignorant white boy,' " and told him he should " 'go jump in a lake.' " Imdieke sent petitioner an email confirming the termination of her employment with LMS.

¶ 8        Borowske confirmed that, as Imdieke's supervisor, she advised him that petitioner's behavior was grounds for immediate termination. Additionally, LMS provided the Department with copies of its email correspondence with petitioner, as well as a copy of the employee manual it had issued to her. LMS' Equal Employment Opportunities Policy states that it affords equal employment opportunities regardless of race. Its expectations regarding Professionalism and Discipline state that all service representatives are to perform their duties in a professional and courteous manner toward store-client personnel and to communicate with LMS employees in a professional manner; any unprofessional communication or violation of these standards may lead to discipline, including termination. And, specifically with respect to Badge and Lanyard and Store Security expectations, the manual states that LMS employees must always wear an LMS badge or lanyard while in a store, and must learn and follow the security policies of the stores to which they are assigned.

Also, LMS submitted to the Department its employee discharge documents from December 16, 2016 to September 22, 2017. These indicated that in the year prior to petitioner's discharge on November 28, 2017, LMS had discharged four service representatives, two of whom were non-black.

¶ 9    Upon the close of its investigation, the Department concluded there was no evidence that LMS discharged petitioner because of her race. It noted that, in contrast, the evidence showed LMS discharged her for "insubordinate, argumentative, and threatening behavior," actions consistent with LMS' discipline policy meriting termination. It further noted that LMS did not treat similarly situated non-black employees more favorably than petitioner, as its documented evidence showed that, immediately prior to her discharge, LMS had discharged four other service representatives, at least two of whom were non-black. Accordingly, the Department recommended a finding of lack of substantial evidence and dismissed petitioner's charge, as "[t]here is no evidence of a nexus between the discharge and [petitioner's] race," "[t]here is no evidence of an animus based on race," and petitioner "failed to establish a prima facie case of race-based discrimination."

¶ 10   Petitioner filed a request for review of the Department's decision with the Commission, arguing that LMS "wrongfully fired her * * * for following the proper protocol." She included allegations that she indeed wore the Target visitor sticker as required, that Target employees (particularly "the non-white hispanic female store mgr.") were liars, and that she never received any prior disciplinary action from Imdieke, as he had outlined. Yet, she then averred that there was never any mention of a visitor sticker policy in her employment materials, and she described the same incidents of prior discipline Imdieke had discussed but insisted these were falsehoods and merely offenses interpreted by Imdieke resulting from

fault that was not her own, all amounting to "additional evidence of race discrimination." She claimed that although other black and non-black employees were also fired, they were terminated "for unethical conduct," while she "was the only responsible and ethical (LMS) black employee that [LMS] discharged." And, she claimed that as "an ethical merchandiser," Imdieke fired her using "premeditated racism" because she was close to obtaining full-time employee status, which would have entitled her to more pay and medical insurance.

¶ 11    The Department responded that its investigation showed LMS did not discharge petitioner because of her race but, instead, that it did so because she was insubordinate. It noted that LMS required all its service representative employees to wear an LMS identification badge while on store premises and to follow all other security measures required by the store to which they were assigned which, at petitioner's Target store, included wearing a store visitor sticker. It also noted that petitioner had been reprimanded for previous behavioral issues, including not wearing a visitor sticker, photographing/submitting work that was not hers, and failing to accept criticism without argument. Petitioner then committed additional insubordinate behavior with respect to the incidents documented on November 28, 2017, which again included failing to wear a Target visitor sticker, being argumentative, making derogatory comments to Target staff and banging on the locked stockroom cage door. Without evidence that LMS did not reasonably and in good faith terminate petitioner's employment, and without evidence that LMS did not terminate similarly situated non-black employees with disciplinary histories comparable to hers, the Department argued that petitioner's charge could not stand.

¶ 12    Petitioner filed a reply, arguing that she "was wrongfully fired" by LMS "for excellent work performance." In addition to reasserting her claims that she "wore her Target Guest

Sticker on every assignment, plus her vendor badge" and that Imdieke fired her "despite her strong compliance to the policy and procedures of [the] LMS Employee manual," petitioner insisted that LMS unlawfully discharged her "as an ethical american black female former employee" in violation of the Act.

¶ 13   After discussing the required elements for an employment discrimination charge and the evidence presented herein, the Commission issued its final administrative decision finding that the Department properly dismissed petitioner's claim for lack of substantial evidence. The Commission noted that petitioner was unable to identify a similarly situated coworker whose race is non-black, whose disciplinary history was comparable to hers, and who was not discharged. Thus, she presented no evidence that LMS treated similarly situated non-black employees more favorably than her. Additionally, the Commission noted that petitioner failed to present any evidence that LMS made any derogatory comments regarding her race or otherwise implemented a pretext when terminating her employment. Rather, as the evidence showed petitioner was terminated because of insubordination, there was "no nexus between [her] discharge and her race." Accordingly, the Commission concluded that petitioner did not present any substantial evidence to show that the Department's dismissal of the charge was not in accordance with the Act.

¶ 14                                    ANALYSIS

¶ 15   As a threshold matter, we note that compliance with Illinois Supreme Court Rule (Rule) 341(h) (eff. May 25, 2018) is mandatory, and a party's status as a *pro se* litigant does not relieve her of her noncompliance with appellate practice rules. See *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8 (compliance with rules governing briefs on appeal is compulsory regardless of a party's status); accord *Ryan v. Katz*, 234 Ill. App. 3d 536, 537 (1992); see also

*In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57 (our supreme court rules, including Rule 341, are not merely advisory suggestions; rather, they are required to be followed). Consequently, where an appellant's brief contains numerous Rule 341 violations and, in particular, impedes our review of the case at hand because of them, it is our right to strike that brief and dismiss the appeal. See *In re Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (citing *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23 (failure to follow Rule 341 may result in forfeiture of consideration of issues on appeal)); see also *Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (quoting *Kic*, 2011 IL App (1st) 100622, ¶ 23 (quoting *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986)) (ultimately, we are " ' "not a depository in which the appellant may dump the burden of argument and research" ' " for her cause on appeal).

¶ 16 In the instant cause, petitioner's brief does not comply with Rule 341(h) in several important respects. That is, save for a general citation to the Act, petitioner's brief does not contain any "Points and Authorities" statement outlining the points argued and authorities cited in the Argument (see Rule 341(h)(1)); it does not contain a viable statement of jurisdiction (see Rule 341(h)(4)); and, while she does provide scant citation to a few pages of the record, petitioner provides essentially no argument, let alone any citation to legal authority for such (see Rule 341(h)(7)), and, upon closer examination, she cites documents that are not part of the administrative record (see *Kensington's Wine Auctioneers and Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 14 (2009) (attachments not contained in certified record on appeal cannot be cited by parties nor considered by reviewing court). Thus, it is within our prerogative to strike her brief and dismiss this appeal based on her failure to comply with the applicable rules of appellate procedure. See

*Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 80; accord *Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (the reviewing court has every right to strike a plaintiff's appellate brief and dismiss her cause when Rule 341 is violated so as to impede review). However, we note that, because we have the benefit here of cogent briefs from respondents Commission and LMS, we choose, in our discretion, to reach the merits of the appeal. See *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶ 14 (reviewing merits of the appeal despite appellant's numerous violations of Supreme Court Rule 341(h)).

¶ 17       Under the Act, "[i]t is a civil rights violation * * * for any employer to * * * discharge" any person "on the basis of unlawful discrimination." 775 ILCS 5/2-102(A) (West 2016). "Unlawful discrimination" is defined in part as discrimination against a person because of her race or skin color. 775 ILCS 5/1-103(Q) (West 2016).

¶ 18       Where a petitioner brings a charge under the Act, the Department shall conduct an investigation to determine whether the allegations are supported by substantial evidence. See 775 ILCS 5/7A-101, 5/7A-102(A)-(D) (West 2016). "Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla" of proof. 775 ILCS 5/7A-102(D)(2) (West 2016). If the Department determines there is no substantial evidence supporting the charge, it shall dismiss the charge. See 775 ILCS 5/7A-102(D)(3) (West 2016). The petitioner may then either commence a civil action in circuit court or, as petitioner did here, file a request for review of the dismissal with the Commission. 775 ILCS 5/7A-102(D)(3) (West 2016).

¶ 19       A final order of the Commission may be judicially reviewed by our Court under the abuse of discretion standard of review. See 775 ILCS 5/8-111(B)(1) (West 2016); *Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶ 32. Under this standard, we

will not disturb the Commission's decision unless it is arbitrary or capricious. See *Young*, 2012 IL App (1st) 112204, ¶ 33. A decision is arbitrary or capricious if it contravenes the legislature's intent, fails to consider a crucial aspect of the problem, or offers an impossible explanation contrary to agency expertise. See *Owens v. Dep't of Human Rights*, 403 Ill. App. 3d 899, 917 (2010).

¶ 20 We review the final order of the Commission, not the Department's decision. See *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989). The Commission's findings of fact "shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8-111(B)(2) (West 2016). This deference to the Commission's findings of fact is particularly true of the credibility determinations it makes. See *Zaderaka*, 131 Ill. 2d at 180; accord *Folbert v. Dep't of Human Rights*, 303 Ill. App. 3d 13, 25 (1999). A reviewing court may not reweigh the evidence or substitute its judgment for that of the Commission, and abuse of discretion will be found only where no reasonable person could agree with the decision rendered. See *Young*, 2012 IL App (1st) 112204, ¶ 33.

¶ 21 In analyzing claims of employment discrimination brought under the Act, we are guided by federal case law relating to analogous federal anti-discrimination statutes, namely, the Civil Rights Act of 1964, which in relevant part protects against employment discrimination on the ground of race or color (42 U.S.C. § 2000e, *et seq.*). See *Zaderaka*, 131 Ill. 2d at 178 (analyzing an employment discrimination action using federal case law addressing claims under Title VII of the Civil Rights Act of 1964); accord *Owens*, 403 Ill. App. 3d at 918.

¶ 22 Because petitioner in the instant cause has provided no direct evidence of discrimination, we must analyze her claim using the three-part test set forth in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973). See *Zaderaka*, 131 Ill. 2d at 178-79 (our state courts have adopted this analytical framework as set forth by the United States Supreme Court decisions addressing such claims); *Young*, 2012 IL App (1st) 112204, ¶ 34; accord *Owens*, 403 Ill. App. 3d at 918-19. Under this test, first, petitioner has the burden to establish a *prima facie* case of unlawful discrimination by a preponderance of the evidence. See *Young*, 2012 IL App (1st) 112204, ¶ 34; see, *e.g.*, *Zaderaka*, 131 Ill. 2d at 178-79. If she meets this burden, a rebuttable presumption of unlawful discrimination arises. See *Young*, 2012 IL App (1st) 112204, ¶ 36; see, *e.g.*, *Zaderaka*, 131 Ill. 2d at 179. Second, to rebut this presumption, respondent LMS must articulate a legitimate, nondiscriminatory reason for its decision. See *Young*, 2012 IL App (1st) 112204, ¶ 36; see, *e.g.*, *Zaderaka*, 131 Ill. 2d at 179 (respondent need only articulate such a reason and is not required to prove it). Third, if LMS does so, the presumption of unlawful discrimination falls and the burden shifts back to petitioner to prove by a preponderance of the evidence that LMS' articulated reason was untrue and merely a pretext for discrimination. See *Young*, 2012 IL App (1st) 112204, ¶ 34; see, *e.g.*, *Zaderaka*, 131 Ill. 2d at 179. Under this test, the ultimate burden remains with petitioner at all times. See *Zaderaka*, 131 Ill. 2d at 179; accord *Owens*, 403 Ill. App. 3d at 919.

¶ 23      With respect to the first part of the *McDonnell* test, to establish a *prima facie* case for employment discrimination, petitioner here must show: (1) she is a member of a protected class; (2) she was meeting LMS' legitimate business expectations; (3) she suffered an adverse employment action; and (4) LMS treated similarly situated employees outside the class more favorably. See *Owens*, 403 Ill. App. 3d at 919. Because petitioner's principle claim is that she was subject to disparate punishment, the second and fourth elements for a *prima facie* case of employment discrimination merge. See *Caskey v. Colgate-Palmolive*

13

*Co.*, 535 F.3d 585, 592 (7th Cir. 2008); accord *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 728 (7th Cir. 2004). Accordingly, an analysis of LMS' expectations "falls by the wayside" and, instead, the focus turns more prominently to whether petitioner can establish that she received dissimilar--and more harsh--punishment than that received by a similarly situated employee who was outside her protected class. *Caskey*, 353 F.3d at 592; accord *Lucas*, 367 F.3d at 728. "A similarly situated employee need not be 'identical,' but [petitioner] must show that the other employee 'dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [her] conduct or [LMS'] treatment of [her].' " *Caskey*, 535 F.3d at 592 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

¶ 24    We hold that the Commission did not abuse its discretion in finding petitioner failed to establish a *prima facie* case of employment discrimination based on her race. The parties do not dispute that petitioner is a member of a protected class (due to her race) or that she suffered an adverse employment action (termination). However, petitioner failed to present any evidence with respect to the remaining (merged) element required to establish a *prima facie* case, namely, that she identify a similarly situated employee outside her protected class who was treated differently, and more favorably, than she was.

¶ 25    First, the evidence presented in this cause clearly shows, contrary to petitioner's insistence, that her employment was terminated because of a pattern of unprofessional, insubordinate and threatening behavior--behavior that began shortly after she was hired by LMS and culminated on November 28, 2017. LMS gave, and petitioner acknowledged receipt of, an employment manual that detailed LMS' policies regarding both the position for

which she was hired and general requirements with respect to security, professionalism and discipline. These included mandates that she wear the appropriate identification at all times of both LMS and the Target store to which she was assigned, that she act toward and address LMS staff and Target employees in a professional and courteous manner, and that termination of employment could result if she did not comply with these policies.

¶ 26     The Department's investigation showed that, contrary to her characterization of "excellent performance" on her assignments and compliance with all the manual's requirements, LMS issued petitioner several warnings about her work in the months between her hire and her termination. She was cited multiple times for not wearing the appropriate security identification while in LMS client stores. She was also counseled for taking unclear and inaccurate photographs of her work, some of which did not belong to her. When disciplined for these incidents, she responded with a flurry of emails to her supervisor Imdieke, always attempting to explain away her fault, shifting blame to other employees, and otherwise being argumentative, which Imdieke warned her needed to stop. Finally, the incidents of November 28, 2017, saw petitioner twice use derogatory language, including at least one instance considerable of a racial epithet (when she called Imdieke "an ignorant white boy"), become physically threatening (when she slammed and banged on a locked stockroom cage door because she was not permitted access), and blatantly disobey and argue with a Target manager, who was LMS' client, until she was officially banned from that store.

¶ 27     Again, petitioner's main claim here is that she was subject to disparate punishment, *i.e.*, that similarly situated employees outside her protected class were treated more favorably by LMS--in her words, while other black and non-black employees were also fired, they were terminated "for unethical conduct," while she "was the only responsible and ethical (LMS)

black employee that [LMS] discharged." Her claim, however, cannot stand. She presented absolutely no evidence of what she proposes. That is, no evidence was ever submitted demonstrating that other employees of any race who also failed to comply with LMS policies concerning security and/or professionalism and who became argumentative and threatening towards others were allowed to remain employed by LMS. In fact, and directly to the contrary, LMS submitted during the investigation here its employee discharge documents from December 2016 to September 2017. These showed that in the year immediately prior to petitioner's termination, LMS discharged four employees, two of whom were not black, *i.e.*, outside petitioner's protected class. This clearly refutes any argument petitioner could attempt to make that LMS treated similarly situated employees outside of her protected class engaged in similar conduct more favorably by receiving less severe treatment. See *Young*, 2012 IL App (1st) 112204, ¶¶ 47-48 (*prima facie* discrimination claim requires evidence that similarly situated person in comparable circumstances received more favorable treatment). From all this, it is obvious that petitioner failed to meet her burden of establishing a *prima facie* case of employment discrimination based on her race by a preponderance of the evidence, and the Commission properly dismissed her cause.

¶ 28    Even if it could somehow be concluded that petitioner did meet her burden of establishing a *prima facie* case (which it cannot), and, thus, a rebuttable presumption of unlawful discrimination can be said to have arisen here (which it did not), we note for the record that LMS articulated a legitimate, nondiscriminatory reason for its actions. As we have already described, LMS provided petitioner with an employee manual outlining mandates with respect to security and professionalism for which she was responsible and detailing the consequences of failing to follow them. And, as we have already discussed at

length, petitioner acknowledged receipt of the manual, proceeded to violate those mandates in several and repeated ways and, consequently, was terminated. It should also be noted that neither LMS' Human Resources Director Schmidt who issued the manual to petitioner, nor supervisor Imdieke who fired her, ever knew petitioner's race, as the evidence showed they only dealt with her via email and telephone calls.

¶ 29    Continuing along these hypothetical lines, assuming petitioner established a *prima facie* case, and with LMS then having articulated a reason for its actions, any presumption of unlawful discrimination would fall here and the burden would shift back to petition to prove, by a preponderance of the evidence, that LMS' reason was a pretext for discrimination. Just as with the other required elements of her cause, this, she cannot do. She provides absolutely no evidence of a pretext for discrimination here by LMS against her, other than her wild speculation and her claims that certain employees lied. See *Folbert*, 303 Ill. App. 3d at 25 ("[a] petitioner's discrimination charge consisting of mere speculation and conjecture does not constitute substantial evidence"); *Roedl v. Midco Int'l*, 296 Ill. App. 3d 213, 219 (1998) (a petitioner's insistence that certain witnesses "were not worthy of belief" by Department does not constitute substantial evidence of pretext); see also *Karazanos v. Navistar Int'l Trans. Corp.*, 948 F.2d 332, 337-38 (7th Cir. 1991) (a petitioner's perception of herself as an employee is irrelevant, as focus is on perception of the employer with respect to the employee's work, and a petitioner's assertions blaming others for her work-related shortcomings, alone, does not create issue of pretext). Again, neither Schmidt nor Imdieke ever met petitioner in person, and the investigation concluded that they were entirely unaware of her race. Even if they knew of her race, and even if LMS set out to treat petitioner less favorably than other employees because of her race or, as she insists, terminate

her right before she obtained full-time status (and, thus, more pay and medical benefits), it is wholly unlikely that they would have given her the multiple opportunities to remediate her behavior they did in the months before finally terminating her, as well as affording her the chance to explain what happened at the Target store following the incidents on November 28, 2017. See *Young*, 2012 IL App (1st) 112204, ¶ 48 ("[u]nder the Act, the unfairness or unreasonableness of an employer's conduct is irrelevant, so long as it was not motivated by an employee's protected characteristic").

¶ 30    Ultimately, the Commission's dismissal of petitioner's charge of employment discrimination for lack of substantial evidence was proper. Petitioner failed to meet the required elements of a *prima facie* case and, even if such a case could be made, LMS provided a non-pretextual reason for her termination from its employ that petitioner cannot show, nor has shown, was untrue. Having failed to present any substantial evidence to satisfy any of the burdens required of her, the Commission properly dismissed her charge.

¶ 31                                      CONCLUSION

¶ 32    Accordingly, for the foregoing reasons, we affirm the Commission's order sustaining the Department's dismissal of petitioner's charge for lack of substantial evidence.

¶ 33    Affirmed.